**Michele OLIVER, by her father and next friend, Robert Jones, et al., Plaintiffs,**

v.

**KALAMAZOO BOARD OF EDUCATION, a body corporate, et al., Defendants.**

No. K–88–71 C.A.

United States District Court, W. D. Michigan, S. D.

Oct. 4, 1973.

Howard & Howard, Kalamazoo, Mich., Louis R. Lucas, Memphis, Tenn., for plaintiffs; Richard A. Enslen and Philip L. Hummer, Kalamazoo, Mich., of counsel.

Ford, Kriekard, Staton & Allen, Kalamazoo, Mich., for Kalamazoo School Board; Arthur Staton, Jr., Kalamazoo, Mich., of counsel.

George F. McCargar, Asst. Atty. Gen., Lansing, Mich., for state defendants.

## OPINION AND ORDER

FOX, Chief Judge.

When matters of great public and constitutional significance come here for resolution, this court assumes an extra duty of care in explaining the reasons for its decision. As always, the court states the factual basis and the legal standards on which its conclusion rests so that the appellate court will know the legal grounds for this court's decision. Equally important, however, this court assumes also an affirmative obligation

to attempt to educate the public concerning the basic principles underlying our constitutional democracy and the practical application of these principles in our public affairs. Since the present school desegregation case is of such importance to the people of Kalamazoo and the State of Michigan, this court has gone to great lengths to detail the facts and explain the basic constitutional principles which led the court to its conclusion.

Plaintiffs, the National Association for the Advancement of Colored People and the parents of children attending the public schools of the Kalamazoo, Michigan School District, bring this action on behalf of themselves and their children and all others similarly situated. Their complaint charges that the defendants, the Kalamazoo Board of Education, the Michigan State Board of Education, and the State Superintendent of Public Instruction, have implemented, developed, maintained, and tolerated public education policies of pupil attendance, staff assignment and facility maintenance which serve to deny plaintiffs equal protection of state law, in violation of the Fourteenth Amendment to the United States Constitution.

This court has previously considered and ruled upon the issue of jurisdiction, and, following a full evidentiary hearing, granted plaintiffs' motion for a preliminary injunction. Oliver v. Kalamazoo Board of Education, 346 F.Supp. 766 (D.C.1971), aff'd, 448 F.2d 635 (6th Cir. 1971). This cause has likewise been found to be a proper Rule 23 class action by way of written opinions both at the time of the preliminary injunction and during trial.

The facts immediately preceding the instigation of suit are summarized in some detail in the court's August 25, 1971 opinion, supra. Following the extensive study of the recognized problems posed by racial isolation in its schools, the Kalamazoo Board of Education adopted, on May 7, 1971, a modified student attendance plan effectively designed to desegregate all elementary schools throughout the district.[1] This decision was preceded by similar action earlier in 1971 with respect to the junior and senior high schools. The resolutions involved called for desegregation of all Kalamazoo schools, commencing in September of 1971.

The new attendance policy was immediately controversial. The campaign preceding the regular spring school board election of June 14 saw extensive popular interest and heated debate concerning the newly adjusted attendance zones. As a result of the election, two vacancies on the board, previously held by individuals who had supported the desegregation effort, were filled by persons strongly opposed to the May 7 action.

Subsequently on July 6, 1971, six days after the new members assumed their offices, the board voted to reinstate the traditional attendance boundaries as they existed before May 7. At the same time, the newly composed board pressed for and, on July 9, secured the resignation of the district's superintendent, Dr. John Cochran, who still had two years remaining on a three-year employment contract.

Plaintiffs filed suit in this court on August 12, 1971. Initially, they requested and obtained a temporary restraining order to prevent the implementation of the July 6 board resolution pending a hearing to test the resolution's constitutionality. After a hearing on August 24 and 25, 1971, the court issued a preliminary injunction declaring the July 6 resolution unconstitutional and void, and ordering the defendants to implement the May 7 plan as scheduled, pending a full trial on the merits of the plaintiffs' complaint. This injunction was subsequently modified on October 7, 1971, to

1. This school attendance plan has been repeatedly referred to in the testimony and will be hereinafter referred to as the "May 7 plan."

restrain the Kalamazoo Board from dismissing all nontenured teachers.[2]

On February 28, 1973, following vast effort in discovery and trial preparation by all parties and the court, trial began. At this time, the Denver case was before the United States Supreme Court, and no decision has yet been handed down. Keyes v. School District No. 1, 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548 (1973). In the prevailing uncertainty, in an abundance of caution, and by agreement of the parties, the court decided as a procedural matter that the parties would present proofs in the usual order. The plaintiffs presented their entire case; the defendants submitted their entire case; and the plaintiffs then offered rebuttal. The burden of going forward on an issue was not procedurally shifted to the other side as a result of a particular line of inquiry. It was agreed that the then existing requirements of Swann v. Charlotte-Mecklenburg Board of Education, 402 U.S. 1, 91 S.Ct. 1267, 28 L.Ed.2d 554 (1971), would be met within the framework of this procedure. This course was taken with the complete understanding that each party would be given a full opportunity to present every conceivable theory of law and all relevant evidence within the disputed areas.

Thus, each party was given the full opportunity to present its case without particular procedural complications. Although it noted objections from each side to the introduction of certain evidence and to the mode or line of particular questions, the court usually reserved ruling and was most liberal in allowing the presentation of evidence and argumentative analysis.

The anticipated Keyes decision, whatever it was, could not possibly require a new round of evidentiary hearings; each party was given the fullest opportunity for hearing consistent with the demands of judicial economy, and the court assured itself of the benefit of all views concerning the complex issues in the case. Six weeks of trial produced more than four thousand pages of testimony and nearly two thousand exhibits. More than one hundred written pages of factual stipulations are included in the record.

I.

The complaint in this case alleges a constitutional violation involving an inequity or inequality in public education deliberately created, maintained, and perpetuated by the State. Initially, the court must determine whether a condition of educational inequity has existed in Kalamazoo.

This inquiry, in turn, is launched with recognition of the uncontroverted threshold proposition that, defined in terms of disproportionate racial concentration, regardless of cause, the Kalamazoo School District historically, and especially in recent times, has been racially segregated at all levels of the school system and at a significant number of schools.[3] Reflecting a pattern which had evolved steadily since before 1940, the school racial census figures for 1959 reveal that several elementary schools were racially identifiable. Roosevelt was 23.3% Black; North Westnedge 22.1%; Harding 13.8%; Edison 13.4%. Lincoln was a combined elementary and junior high, with 62.2% of the students being Black. Of all the students in the district, only 7.5% were Black at that time.

The more complete school racial census figures for 1969 indicate that the historical trend toward racially identifiable schools had continued and even ac-

2. The probationary teachers included within their ranks roughly one half of all the black teaching staff in the district. Oliver v. Kalamazoo Board of Education, supra, 346 F.Supp. at 782–783.

3. As used in this opinion, the terms "racial segregation," "racial concentration," "racial imbalance," "racial identifiability" and "racial isolation," shall refer relatively interchangeably to a condition of disproportionate racial distribution of students. This usage conforms to the practice of most witnesses and authorities introduced at trial.

celerated in the decade of the 1960's. Of the 29 regular elementary schools, 5 contained 92.3% of all Black elementary children. In a system in which 16.1% of the elementary children were Black, Lincoln school was 95.6% Black; Northglade 87.2% Black; Woodward 53.8% Black; Roosevelt 38.8% Black; and Edison 17.1% Black. With the exception of McKinley and West Main, which were 8.8% and 7.4% Black, respectively, all of the remaining elementary schools in the Kalamazoo district contained no more than 5% Black children. The 1969 statistics further reveal that 14 of these schools educated less than 5 Black students each, while six, Fairview, Greenwood, Milwood, Oakwood, Parkwood and Peter Pan, held no Black pupils.

In 1969, Kalamazoo had 5 junior high schools. Of the total junior high student population, 14.7% was Black. Two junior highs, Milwood and Oakwood, contained a combined total of 27 Black students. Only 1.7% of the students attending each of these schools was Black. This left 95.5% of Kalamazoo's Black junior high pupils to attend South, Hillside and Northeastern in proportions of 26.2%, 24.6% and 13.9%, respectively. At the senior high level, one of the district's two schools enrolled virtually all of the Black senior high school students. The 1969 figures show that 93% of these Black students attended Central High School, making that school 19.7% Black, while the remainder attended Loy Norrix High School, making that school 1.-6% Black.

Responsible state and Kalamazoo authorities regarded Kalamazoo public schools as segregated in 1969. The Michigan Civil Rights Commission's "Report and Recommendations into the Status of Race Relations in the City of Kalamazoo," published in 1969, stated, "Schools in Kalamazoo are generally segregated," and cited the supporting data.[4]

Even more important, the Kalamazoo citizens' Committee on Integration, which had been appointed by the President of the Board of Education, recited the attendance figures for elementary, junior high, and senior high schools for September, 1968, and concluded that the figures illustrated "the serious extent to which racial segregation exists in the Kalamazoo school district."[5] The Committee went on to recommend a program for the integration of the public schools at all levels. This recommendation became the basis for the discussions leading to the May 7 plan. The hostile reaction of many in Kalamazoo to desegregation efforts is evidence that these people, too, regarded Kalamazoo schools as segregated. In light of the Supreme Court's admonition to consider "the community and administration attitudes toward the school" in determining whether schools are segregated, Keyes, supra, 413 U.S. at 196, 93 S.Ct. at 2691, this court regards the evidence of the opinion of the people of Kalamazoo as of special significance.

Thus, it is beyond question that the Kalamazoo school district was, in fact, racially segregated. The court finds as a matter of demonstrable fact and established law that this condition of segregation resulted in inequitable and unequal educational opportunities for Black and White students. Educational inequity is a necessary consequence of racial separation of the schools. The reasons which explain this fact are complex, being intricately rooted in the tortured history of race relations of this nation.

According to Dr. Robert L. Green, eminently qualified at trial as an expert

---

4. At 11.

5. Committee on Integration [sometimes referred to popularly as the Committee on Racial Balance], "Report of the Committee on Racial Balance," Aug. 18, 1969, at 3. Pl.Ex. 38. The Committee on Integration was created by the President of the Kalamazoo Board of Education on Nov. 6, 1968. Id., App. B, 11. Since the Committee was to consider and did consider socio-economic as well as racial problems, it is unclear why it came to be called by some the "Committee on Racial Balance."

witness in the field of educational psychology and on the effects of segregation on Black and White students, the Black experience has been unique in American history.[6] No other racial or ethnic minority was systematically enslaved by the White majority. Rather than having suffered the temporary discomfort and annoyance of social ostracism common to first-generation European ethnic groups, Blacks for hundreds of years were subjected to legally and socially institutionalized economic, spiritual, psychological, social and educational deprivation.

It is appropriate to note Gunnar Myrdal's observation on slavery in his classic, An American Dilemma, in his chapter on "Inequality of Justice:"

> Under slavery the Negro was owned, bought, and sold as property; he was worked, housed, fed, and prevented from doing what he wished if it was contrary to the interests of his master. In general, the Negro slave had no "rights" which his owner was bound to respect. Even if in legal theory the slave was given the status of a person under the law as well as the status of property, it was the latter viewpoint which, in practice, became the determining one. In the very relationship between master and slave it was inherent that—without recourse to courts—force and bodily punishment and, under certain circumstances, even the killing of the slave was allowed. " . . . all slaveholders are under the shield of a perpetual license to murder," exclaimed Hinton R. Helper in his unsparing onslaught on the plantation class and the slavery institution. Thomas Jefferson saw clearly the moral danger of the slavery institution:

> The whole commerce between master and slave is a perpetual exercise of the most boisterous passions, the most unremitting despotism on the one part, and degrading submissions on the other. Our children see this, and learn to imitate it. . . . The man must be a prodigy who can retain his manners and morals undepraved by such circumstances. *And with what execration should the statesman be loaded, who,* permitting one half the citizens to trample on the rights of the other, transforming *those into despots, and these into enemies, destroys the morals of one part, and the amor patriae of the other.* . . . [Can] the liberties of a nation be thought secure when we have removed their only firm basis, a conviction in the minds of the people that *these liberties are the gift of God?* That they are not to be violated but with His wrath? Indeed, I tremble for my country when I reflect that God is just; that His justice cannot sleep forever." [7] (Emphasis supplied.)

Unfortunately, White attitudes originally attendant to the institution of slavery persisted after the adoption of the Thirteenth Amendment. Although legal slavery died, Americans created, during the four decades after the Civil War, a new legal and social pattern of discrimination based upon race. Many of these forms of institutionalized repression have persisted to the present, with the result that Black Americans are often denied the equality to which they are entitled in our constitutional democratic republic.

Inextricably intertwined with the dominating inescapable heritage of slavery and all its attendant dehumanizing ramifications, every aspect of the human condition of many Black people in America today is almost irremediably repressed. These continuing inhuman conditions of uncivilized servitude and inferior status have become known as vestiges of slavery.

---

6. Much of the following on the effects of segregation on students is taken from the testimony of Dr. Green, Tr., Vol. 8.

7. At 530–531 (1944).

The effects of this historical status of subservience and formalized inferiority continue to be pervasive. Past barriers to personal fulfillment and attainment cannot reasonably be minimized in assessing current impediments to equal opportunity. In the context of past officially sanctioned and present subtly insidious and invidious private and public racial discrimination against Black people as a class, a school environment which for whatever reason involves marked, disproportionate racial concentration inherently generates acute consciousness of race. As situated in a segregated surrounding, this inflated consciousness, studies described at trial have shown, triggers artificial, unrealistic personal reactions based on misconceived but, in view of historical predicates, *understandable individual perceptions of the significance of racial differences.*

Although disproportionate racial concentration of Black children in the schools might not have adverse consequences in all times and places, it certainly does in the context of the present forms of social organization, which are conditioned by legacy of slavery. One of the adverse effects of racial segregation is in the area of individual achievement.

According to studies made by Dr. Green and others, segregated Black children tend to infer that they are isolated from the White majority because of their race, and, drawing on their observations of the deprivations experienced by Black adults, they also tend to infer that their own potential is limited because of their race. It is not surprising that Black children have evidenced reduced self-esteem in a segregated environment and concomitant diminished motivation to succeed. The culturally-induced lack of self-esteem and diminished motivation in turn operate to measurably reduce achievement.

Thus, in Kalamazoo, where many Black students attend disproportionately Black schools, Black students have fallen as many as four grades behind their White counterparts by the time they leave school. Furthermore, the Citizens' Committee on Integration, popularly referred to as the Committee on Racial Balance, reported in 1969 that identifiably Black schools ranked at the bottom of the system in terms of academic achievement.[8]

During the trial, there was much conflicting testimony concerning the incidental question of whether a September 1972 administration of a Metropolitan Achievement Test in Kalamazoo did or did not establish that Blacks enter school in Kalamazoo at or around the national norm in the first grade. Mr. Robert J. Huyser, Director of the State Education Assessment program, and Dr. William Coats, Kalamazoo's Superintendent of Schools, strongly disagreed on this question. Dr. Coats has both theoretical knowledge and great practical experience in the sometimes esoteric subject of educational testing, and also has a close personal acquaintance with the Kalamazoo situation. Mr. Huyser's responses on cross-examination suggest that he did not properly interpret the data. The court thus finds that Dr. Coats' testimony was the more reliable, and that Black children enter Kalamazoo schools at a very competitive level.

Individual growth in the educational system occurs not only in the area of achievement, the acquisition of cognitive skills, but also in the areas of social and psychological development. Segregation is perhaps more detrimental to the Black student's social and psychological development than to his achievement level. Finding himself isolated to a significant degree from the bulk of the White population, witnessing the disparate superiority of the status of White adults over Black adults in many circumstances, and perhaps further observing a pronounced underrepresentation of Blacks in positions of leadership in his school, where this is the case, the Black child may be-

8. Committee on Integration, supra, note 7 at 3.

**156**

come reluctant to assert himself in the presence of Whites and unduly pessimistic concerning his ability to interact or compete successfully with Whites of his own generation.[9]

Teacher reaction to segregated educational circumstances frequently operates to the disadvantage of students. Dubbed by some researchers as a kind of "self-fulfilling prophecy," the impact on Black students of teacher expectations based on race has been demonstrated by several studies. Affected by racial stereotypes as well as by actual patterns of disparate Black-White performance levels in the general society, teachers may tend to "teach down" to Black children, expecting and therefore eliciting low levels of performance.

As Dr. Green further testified, racially segregated schools usually tend to be perceived as "good" or "bad" depending solely on whether they are identifiably White or Black, respectively. Such community perceptions, held by Blacks as well as Whites, contributes to the negative, repressive atmosphere surrounding a segregated school and inhibiting social, psychological, and cognitive development by Black students.

The negative impact of racially segregated schools is not confined exclusively to Black students. White children may also react to racial isolation in ways harmful to themselves. White pupils are apt to form an irrational attitude of *inherent superiority and are apt to develop an unrealistic concept of homogeneous society in which certain values enjoy universal acceptance.* Similarly, because of their cultural isolation, segregated White children tend *to lose sight of those fundamental values of our constitutional system which, while respecting individual differences, favor free access and wide social mobility to all persons regardless of race, creed, or national origin, and which thereby promote a*

*healthy interchange among persons of different backgrounds.*

The state of mind fostered by racial and cultural isolation heightens racial conflicts and divisiveness in the country and thus adversely affects the domestic tranquility the Constitution was designed to promote. White students who have been educated in segregated public schools are thus ill-prepared to deal with the pluralistic society which actually exists in the adult world beyond the classroom.

In part because of segregated schools, as Charles E. Silberman has written:

"[T]he public schools are failing dismally in what has always been regarded as one of their primary tasks—in Horace Mann's phrase, to be *'the great equalizer of the conditions of men,'* facilitating the movement of the poor and disadvantaged into the mainstream of American economic and social life. Far from being 'the great equalizer,' the schools help perpetuate the differences in conditions, or at the very least, do little to reduce them. *If the United States is to become a truly just and humane society, the schools will have to do an incomparably better job than they are now doing of educating youngsters from minority-group and lower-class homes."* [10]

(Emphasis supplied.)

The subject of race in America and the consequences of racial segregation in the schools might be explored at much greater length. However, it clearly appears from the record in this case, summarized above, that in the context of modern America, segregated education is detrimental to both Black and White students, creating, especially for Black students, psychological and social difficulties which have a substantial adverse impact on overall individual development. Segregated education plainly denies equal educational opportunity.

9. 1 U.S. Commission on Civil Rights, Racial Isolation in the Public Schools 114 (1967).

10. Quoted in Senate Select Committee on Equal Educational Opportunity, Toward Equal Educational Opportunity, Sen.Rep.No. 92–000, 92nd Cong., 2d Sess., Part III. Inequality in Education 95 (1972).

The findings made by the court in this case parallel those made by the United States Supreme Court in Brown v. Board of Education, 347 U.S. 483, 74 S.Ct. 686, 98 L.Ed. 873 (1954) [Brown I]. In addressing the precise issue of the effect of racial separation on grade and high school students, the Supreme Court in Brown quoted with approval language from the District Court as follows:

> "'Segregation of white and colored children in public schools has a detrimental effect upon the colored children. The impact is *greater* when it has the sanction of the law; for the policy of separating the races is usually interpreted as denoting the inferiority of the negro group. A sense of inferiority affects the motivation of a child to learn. Segregation with the sanction of law, therefore, has a tendency to [retard] the educational and mental development of Negro children and to deprive them of some of the benefits they would receive in a racial[ly] integrated school system.'" 347 U.S. at 494, 74 S.Ct. at 691. (Emphasis supplied.)

Although much may be said about the fact that Brown involved obvious and conspicuous state action separating Blacks and Whites by statute, with respect to the simple issue of whether racial separation fundamentally poses a situation of inequity, Brown was and is unequivocal. "Separate educational facilities are inherently unequal." 347 U.S. at 495, 74 S.Ct. at 692.

## II.

The Fourteenth Amendment of the United States Constitution declares, "No State shall . . . deny to any person within its jurisdiction the equal protection of the laws." [11] The law is clear that official action at any hierarchial level which denies the plaintiffs equal protection of the laws is unconstitutional. Ex parte Virginia, 100 U.S. 339, 346–347, 25 L.Ed. 676 (1880). It is established "under the Constitution and laws of Michigan that the public school system is a State function and that local school districts are instrumentalities of the State created for administrative convenience." [12] Members of local school boards as well as members of the State Board of Education and the Superintendent of Public Instruction are State officers, agents of the State in every official respect.

Before entering upon the duties of their respective offices, all are required by the Michigan Constitution of 1963, Art. II, Sec. 1, to take and subscribe to the following oath or affirmation: "I do solemnly swear (or affirm) that I will support the Constitution of the United States and the constitution of this state, and that I will faithfully discharge the duties of the office of . . . according to the best of my ability." Each officer thus undertakes a personal and official responsibility to abide by the Constitution of the United States and of Michigan.

The principal issue in this case is whether the defendant State officers have denied the plaintiffs equal protection of the laws.

For the purposes of this case, the court assumes that the plaintiffs must establish that the defendants are guilty of de jure segregation of the Kalamazoo public schools. The Fifth Circuit, which has a vast experience with school desegregation cases, recently rejected "the anodyne dichotomy of classical de facto and de jure segregation." Cisneros v. Corpus Christi Independent School District, 467 F.2d 142, 148 (1972).

---

11. Pertinent excerpts from Supreme Court cases interpreting the Fourteenth Amendment are included in the Appendices. App. A.

12. Bradley v. Milliken, 484 F.2d 215, at 246 (6th Cir. 1973) (en banc). The analysis of State law concerning education in Michigan in Id., 246–249, is adopted and incorporated by reference for the purposes of this opinion.

That court held that a finding of unlawful segregation would be supported by two distinct factual determinations. "First, a denial of equal educational opportunity must be found to exist, defined as racial or ethnic segregation. Secondly, this segregation must be the result of state action." While the specific quantity of state action and the severity of the segregation necessary to sustain a constitutional violation was left to be dealt with on a case by case basis, the court noted that, as a general rule, it "need only find a real and significant relationship, in terms of cause and effect, between state action and the denial of educational opportunity occasioned by the racial and ethnic separation of public school students." Id., at pp. 150–151.

■ However, the Supreme Court, in Keyes, supra, assumed for the purposes of that case that a finding of de jure segregation was required to support a finding of a constitutional violation. This court follows the Supreme Court for the purposes of the present case, and, like the Supreme Court, leaves for further adjudication in other cases the question of whether something other than de jure segregation constitutes a violation of the Fourteenth Amendment.

The Kalamazoo board adopted a reasonably comprehensive desegregation plan on May 7, 1971, and then, after an election, rescinded the plan on July 6, 1971. While these events and their importance are explored in more detail later, it is pertinent to inquire here as to the legal standards for determining whether the July 6 rescission was itself a significant de jure act of segregation. In Denver, the school board adopted three resolutions, 1520, 1524 and 1531, to desegregate schools in the Park Hill area, and then subsequently rescinded them. While the trial court enjoined the rescission of these resolutions as to most of the schools after a finding that these schools had been intentionally segregated by the Denver school board, the court also permanently enjoined the rescission of the plan as to two schools, East High

and Cole Junior High, which had not been previously segregated. The court found that the original plan would operate to prevent East High from becoming segregated and to improve educational opportunities for Black students at Cole, and held that the frustration of these objectives by a rescission of the plan was in itself unconstitutional. Keyes v. School District No. 1, 313 F.Supp. 61, 67 (D.Colo.1970). The decree was approved by the Tenth Circuit on appeal, although the appellate court did not reach the question of the rescission. 445 F.2d 990, 999, 1007 (1971). As to this portion of the Tenth Circuit's action in the Denver case, the Supreme Court denied certiorari. 413 U.S. 189, 93 S.Ct. 2686, 37 L.Ed.2d 548. However, it is especially significant that the Supreme Court noted with implied approval that the trial court had found that the rescission of the desegregation plan as to Cole and East was itself an intentionally segregative act. Id. at 199, n. 10, 93 S.Ct. at 2693.

■ The Sixth Circuit has addressed the issue of the validity of a nullification of a desegregation plan in Bradley v. Milliken, 433 F.2d 897 (1970). Relying in part on the trial court's decision in Keyes, supra, the Sixth Circuit broadly and emphatically declared:

"State action in any form, whether by statute, act of the executive department of a State or local government, or otherwise, will not be permitted to impede, delay or frustrate proceedings to protect the rights guaranteed to members of all races under the Fourteenth Amendment." Id. at 902.

The court went on to strike down as unconstitutional a legislative attempt to nullify a plan of the Detroit school board to desegregate its high schools. Since the Fourteenth Amendment plainly reaches all state action, and since the Sixth Circuit relied in part on Keyes, supra, which did not involve an attempted legislative nullification, it appears that the Bradley doctrine must extend to actions of state agencies such as local school boards.

Thus, on the strength of Keyes, supra, and Bradley, supra, it appears that the Kalamazoo board's attempted nullification of the May 7 plan is itself a de jure segregative act and a constitutional violation entitling the plaintiffs to a remedy in this court, if the May 7 plan was a significant and bona fide attempt by the school board to implement the Fourteenth Amendment in Kalamazoo schools. This factual question, and others related to the adoption and rescission of the desegregation plan, are discussed further below.

However, as in Keyes, supra, so in this case, in an abundance of caution, neither the court nor the parties have been satisfied to litigate only the issue of the rescission of the May 7 plan. Rather, the plaintiffs have argued at length that the defendant state and local authorities were legally responsible under the Fourteenth Amendment for the segregated conditions which have existed in Kalamazoo, and that therefore, the Kalamazoo board was constitutionally required to adopt a substantial desegregation plan on May 7, 1971. The defendants have vigorously denied that they were responsible for the segregated conditions found to exist in Kalamazoo, and have insisted that the May 7 plan was not constitutionally required.

■■ As a first step toward resolving this issue, the court has had to ascertain the legal standards to be applied to determine whether the defendants have been guilty of de jure segregation before May 7, 1971. Although not as fully refined as the comparatively ancient common law torts, the major legal elements and conditioning factors of the constitutional tort of de jure segregation [13] are reasonably clear. Under the Keyes theorem, in addition to showing that segregated schools exist, plaintiffs should establish (1) that the state to a significant degree caused or maintained these segregated conditions, and (2) that the state intentionally, i. e., purposefully, created or maintained them.

■■ Experience since Brown I, supra, has revealed that circumstantial factors of space, time, and quantity may affect causation and intention, and thus may affect the finding of liability and the extent of the remedy. Keyes, supra. Spacial factors are matters of geography and demography in a school district which may limit the impact of a school board's actions. Time is also an important, though sometimes elusive factor. While each school desegregation case requires an extensive probing of the historical development of a school district, the state, and the nation, the ultimate focus is the present situation and remedy, if any, which is presently required. Finally, matters of quantity and degree of space, time, causation and intention certainly affect the finding of liability.

Before moving to an examination of the central factual issues, it is necessary to discuss further these major elements and conditioning factors as they relate specifically to the case before the court.

Under Keyes, in an intentional case, to be guilty of a constitutional violation, the state and local authorities must have in fact caused or maintained the segregated conditions which are complained of. Under this theory, it is a complete defense that the state and local authorities have not at all caused or maintained these conditions. Similarly, the state will not be held legally responsible if it has only occasionally committed segregative acts and these acts are of trivial importance and bear no significant relation to the modern situation.

■ Rather, the standard must be that the state and local agencies to a substantial degree contributed to the creation or maintenance of segregated schooling in Kalamazoo. In a tort case, it would be proper to instruct the jury

---

13. While the substantive requirements of the constitutional tort are derived from the Fourteenth Amendment and to a lesser extent from various implementing statutes, this court has jurisdiction by virtue of several jurisdictional statutes passed by Congress.

on the issue of proximate cause as follows: "An injury or damage is proximately caused by an act or a failure to act, whenever it appears from the evidence in the case, that the act or omission played a substantial part in bringing about or actually causing the injury or damage; and that the injury or damage was either a direct result or a reasonably probable consequence of the act or omission." [14]

Under this theory, the issue of causation also involves the conditioning special factors discussed by the Supreme Court in Keyes, supra. Denver had two areas of minority group concentration and segregated schools, the Park Hill section and the core city area. Lower courts had found that the school authorities had intentionally segregated Park Hill, and had ordered desegregation of that section. The Supreme Court did not question the correctness of this ruling, but explored its significance with respect to the core city and other Denver schools.

Among other things, the Supreme Court suggested that Park Hill might be a "separate, identifiable and unrelated section of the school district," and remanded for further findings on this issue, Keyes, supra, 413 U.S. at 205, 214, 93 S.Ct. 2696, 2700. If Park Hill was found to be separate, the range of available remedies would apparently be limited, even if the core city schools were found on remand to be intentionally segregated. Id. at 214, 93 S.Ct. at 2700.

■ On the basis of its examination of maps, verbal testimony and census and other demographic data, this court finds that Kalamazoo, for the purposes of this case, is to be treated as a single, undivided district. While there is an arc of minority concentration running from the north central portion of the city to the east and southeast central portion, there is no area in Kalamazoo

which corresponds to the Park Hill section of Denver geographically or historically. Moreover, this court finds that there is no section of Kalamazoo which is a "separate, identifiable and unrelated" unit by reason of geography or a natural or artificial boundary. Keyes, supra, 413 U.S. at 205, 93 S.Ct. at 2696. In the northeastern part of the city, the Kalamazoo River apparently sets off a separate section. However, while the river has been used to set elementary and junior high school boundaries, it has not usually been used to set senior high boundaries. Apparently, the school authorities or the people of Kalamazoo have not consistently regarded the northeast section as separate from and unrelated to the rest of the school district.

In addition, on both sides of the river near the center of the city there are concentrations of minority people and there were, in 1970, racially identifiable schools. Most minority people and pre-1971 racially identifiable schools were located west and south of the river, outside the northeast section.

Elsewhere in Kalamazoo, railroad tracks, highways, and major roads slice into the city. While Kalamazoo authorities have sometimes taken these features into account for planning purposes, no combination of them isolates a section which has been consistently regarded or treated as a distinct section. Consequently, there is no need for the court to subdivide Kalamazoo into separate geographical units, and to consider the possibility of a separate remedy, or no remedy, for each section.

Moreover, relative to Denver, Kalamazoo is a geographically different and compact school district. Any significant Kalamazoo school board action with respect to any number of schools must, in the absence of particular qualifying circumstances, be considered as affecting a

14. 2 Devitt and Blackmar, Federal Jury Practice and Instructions Sec. 73.18 (2d ed. 1970). Of course, there might be more than

one "proximate cause." See proposed jury instruction, Id. at Sec. 73.19.

"meaningful" or "substantial" portion of the Kalamazoo school system [15] within the meaning of Keyes, supra, 413 U.S. at 199–214, 93 S.Ct. at 2693–2700. This is because an action which affects any one school necessarily has a reciprocal effect on other schools within the system.

As Judge John Minor Wisdom of the Fifth Circuit, which has extensive experience with desegregation suits, recently stated: "Infection at one school infects all schools. To take the most simple example, in a two school system, all blacks at one school means all or almost all whites at the other." United States v. Texas Education Agency, 467 F.2d 848, 888 (1972), cited in Keyes, supra, 413 U.S. at 201, n. 12, 93 S.Ct. at 2694. Similarly, any decision to build a new school or to expand existing facilities necessarily entails a decision not to expend the committed resources on other schools or programs within the system.

An additional problem concerning causation ought to be noticed, although it cannot be extensively discussed at this point. Although the Fourteenth Amendment refers broadly to *state* action, most courts have assumed that in the absence of state statutes of the type at issue in Brown I, supra, it was simply irrelevant whether state agencies other than school authorities were implicated directly or indirectly in the creation or maintenance of segregated schools. The only relevant question has been whether local school boards were legally responsible for the segregated conditions found to exist. However, in this case, the school board claims that it has merely applied a racially neutral neighborhood school policy, and that neighborhood residential segregation is responsible for the resultant segregated schooling. In light of the general words of the Fourteenth Amendment, it becomes relevant to inquire in assessing the validity of this defense whether state agencies other than school boards have, by their deliberate actions and inactions, contributed to a significant degree to the creation or maintenance of segregated neighborhoods. This issue, and its impact on the present case, is discussed in Part III, infra.[16]

Under Keyes, defendants must not only have caused the schools to be segregated, but must have intentionally caused them to be segregated. Ascertaining the board's intentions is certainly difficult, but it is not at all impossible.

The starting place is the standards and processes evolved by the common law for determining the relevant state of mind of the defendant, or defendants, in an intentional tort suit. The Supreme Court and the Sixth Circuit Court of Appeals have said that one of the Congressional statutes relied upon by the plaintiffs in this case, 42 U.S.C., Section 1983, "should be read against the background of tort liability that makes a man responsible for the natural consequences of his actions." Monroe v. Pape, 365 U.S. 167, 187, 81 S.Ct. 473, 484, 5 L.Ed.2d 492 (1961); Pierson v. Ray, 386 U.S. 547, 556, 87 S.Ct. 1213, 1219, 18 L.Ed.2d 288 (1967); Puckett v. Cox, 456 F.2d 233, 235 (6th Cir. 1972); see Fitzke v. Shappell, 468 F.2d 1072 (6th Cir. 1972). In general, it is reasonable to infer that people intend the natural and probable consequences of acts knowingly done or knowingly omitted. Thus, in a case tried to a jury, it would be proper to instruct that:

"In the absence of evidence in the case which leads the jury to a different or contrary conclusion, you may

---

15. In 1969, Kalamazoo had 25 regular elementary schools, 5 junior high schools and 2 high schools. It also had a number of relatively small special purpose buildings and schools.

16. However, this court does find infra, apart from the action of other state agencies vis-a-vis segregated neighborhoods, that the Kalamazoo Board of Education itself committed a constitutional violation through its actions and inactions which intentionally and substantially contributed to the creation and maintenance of segregated schools in the district.

draw the inference and find that any person involved intended such natural and probable consequences as one standing in like circumstances, and possessing like knowledge, should reasonably have expected to result from any act knowingly done, or knowingly omitted, by such person. An act, or failure to act, is knowingly done, if done voluntarily and intentionally, and not because of mistake or accident or other innocent reason." [17]

Since intent may be proved by direct, indirect or circumstantial evidence, all the facts and circumstances in evidence in the case which may aid in the determination of state of mind may be considered.[18]

Fortunately, this court is not without guidance in applying these basic standards to the complex school desegregation case presently before it. It is established that where an appropriate factual showing has been made, including a showing that an existing segregated situation is to a significant extent the natural, probable, and actual result of the actions and inactions of the state and local agencies, the plaintiffs have laid an evidentiary foundation for the conclusion that the results, segregated schools, were intended to be reached by these authorities. Bradley v. Milliken, 484 F.2d 215, at 222, 241–242 (6th Cir. 1973) (en banc); Davis v. School District of Pontiac, 309 F.Supp. 734, 744 (E.D.Mich. 1970), aff'd, 443 F.2d 573 (6th Cir. 1971), cited with implied approval, Keyes, supra, 413 U.S. at 210, 93 S.Ct. at 2698. In the district court decisions in the Denver case, the court inferred de jure segregation from among other things, the fact that the school board had located a new elementary school "with conscious knowledge that it would be a segregated school." Keyes v. School District No. 1, 303 F.Supp. 279, 285 (D.

Colo.1969), cited with approval, 413 U.S. at 201, 93 S.Ct. at 2694. Of course, in order to make its ultimate determination on the issue of intention, the court must fully consider the evidence and arguments presented by all the parties, including the claim by the Kalamazoo school board that it was resolutely applying a racially neutral neighborhood school policy.

Some courts have further refined the standard of proof to be applied in light of special circumstances found in particular school desegregation cases. Thus, the finding that some schools had almost exclusively Black students and faculties and other schools had almost exclusively White students and faculties was held to create a "presumption" that faculty assignments were made on a discriminatory basis. The effect of the presumption was to place an affirmative burden on the school authorities to demonstrate the constitutionality of their acts. United States v. School District 151, 301 F. Supp. 201, 228 (N.D.Ill.1969), mod. on other grounds, 432 F.2d 1147 (7th Cir. 1970), cited with implied approval, Keyes, supra, 413 U.S. at 209, 93 S.Ct. at 2698.

In Keyes, the Supreme Court, noting the relevance of a finding of intentional segregation in one portion of a school system to the issue of the board's intent with respect to other segregated schools, Id. at 208, 93 S.Ct. at 2697, expressly held that "a finding of intentionally segregative school board actions in a meaningful portion of a school system . . . establishes . . . a prima facie case of unlawful segregative design on the part of school authorities, and shifts to those authorities the burden of proving that other segregated schools within the system are not also the result of intentionally segregative actions." Id.

---

17. 2 Devitt and Blackmar, supra note 16 at Sec. 74.03. The term "other innocent reason" at the end of the final sentence refers in this context not to defenses in the area of causation or to such affirmative defenses as consent or self-defense, but rather refers to matters analogous to mistake or accident which would tend to negate knowledge or affirmative purpose.

18. Id.

■ The issue of whether a constitutional violation has been committed is affected not only by the circumstantial factors highlighted in Keyes, supra, but also by the fact that the state acts at several governmental levels. The law is clear that official state action at *any* hierarchial level which directly and intentionally creates, sustains, maintains, or aggravates racial segregation in schools may be cited by plaintiffs to hold defendants accountable for the inequities which result.

■■ By the terms of the Michigan Constitution, Art. VIII, Sec. 3, the State Board of Education is given "leadership and general supervision over all public education." Because the State Board possesses such broad constitutional power, its deliberate action and inaction must be weighed in the judicial evaluation of the issue of state governmental responsibility for the establishment and maintenance of unequal educational opportunity. Under certain circumstances, conscious neglect, even though characterized as "benign" by some who do not suffer the ill effects, can be very significant for the development of policy, especially where the clearly foreseeable and actual result is to allow the creation or to ensure the maintenance of a segregated condition in the public schools.

■ However, the immediate task is to determine whether the Kalamazoo school board, apart from and independent of any other state agencies, by its actions and inactions, its commissions and omissions, intentionally contributed in a significant way to the creation or perpetuation of segregated schools. In making the determination, the court must, within the limits of its capabilities, examine all the relevant evidence and consider all the relevant arguments. The focus must be not only each individual school board action, but also the evolving *pattern* of school board policy. As the Sixth Circuit pointed out in Davis, supra, each school board decision taken alone might not compel the conclusion that the Board of Education intended to foster segregation but, taken together, the decisions might lead to the conclusion that a "purposeful pattern of racial discrimination has existed in the * * * school system" in the past. 443 F.2d at 576.

■ Although the State government retains ultimate legal control and exercises much actual control, in practice the Kalamazoo Board of Education has had primary if not exclusive operational control over Kalamazoo public schools. Thus, the local board sets attendance zones, locates and constructs new schools, adds permanent or temporary classrooms to or completely modernizes old schools, decides whether or not to annex new areas, and hires and assigns administrators and faculty. Since school board decisions of these matters substantially determine the racial composition of students and faculty in each of its schools, the board must be held responsible in fact for any segregated condition which exists. That the board has power to substantially reduce segregated conditions is obvious from the terms and results of the May 7 plan, all of which are within the board's operational authority.

■ Furthermore, over the long run, school board choices with respect to the location and capacity of schools, combined with other policy decisions, may help to determine the racial composition of neighborhoods, as the Supreme Court has noted:

The construction of new schools and the closing of old ones are two of the most important functions of local school authorities and also two of the most complex. They must decide *questions of location* and *capacity* in light of population growth, finances, land values, site availability, through an almost endless list of factors to be considered. The result of this will be a decision which, when combined with one technique or another of student assignment, will determine the racial composition of the student body in each school in the system. Over the long run, the consequences of the choices will be far reaching. People

gravitate toward school facilities, just as schools are located in response to the needs of people. *The location of schools may thus influence the patterns of residential development of a metropolitan area and have important impact on composition of inner-city neighborhoods.*

In the past, choices in this respect have been used as a potent weapon for creating or maintaining a state-segregated school system. In addition to the classic pattern of building schools specifically intended for Negro or white students, school authorities have sometimes, since *Brown,* closed schools which appeared likely to become racially mixed through changes in neighborhood residential patterns. This was sometimes accompanied by building new schools in the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of "neighborhood zoning." Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well promote segregated residential patterns which, when combined with "neighborhood zoning," further lock the school system into the mold of separation of the races. Upon a proper showing a district court may consider this in fashioning a remedy.

In ascertaining the existence of legally imposed school segregation, the existence of a pattern of school construction and abandonment is thus a factor of great weight. Swann, supra, 402 U.S. 20–21, 91 S.Ct. 1278–1279. See also Keyes, supra, 413 U.S. at 199, 93 S.Ct. at 2693; Davis, supra, 443 F. 2d at 576; Kelley v. Guinn, 456 F.2d 100 (9th Cir. 1972). (Emphasis supplied.)

The Board alleges that for many decades before the adoption of the May 7, 1971 plan, it exercised its' extensive powers according to a "neighborhood school policy." In general, the policy was that consideration was given to providing an adequate number of classroom desks in the general area of the children's residence.

Just before World War II, the stated policy was to establish a half-mile radius as a suitable attendance zone for elementary schools, although this radius was later increased to three-quarters of a mile. A junior high, according to the pre-World War II policy should not require the majority of its students to go more than a mile. Two or three miles were not considered unreasonable. A standard elementary school would have 13 rooms, and a student capacity of about 392. In addition, the policy envisioned a uniform curriculum, with uniformly adequate facilities for carrying out the curricular program. The major goals and principal standards of the neighborhood policy have allegedly been in effect during the entire period after World War II until 1971. Allegedly, the policy has always been administered in a racially neutral fashion.

██ Some aspects of this policy would be unobjectionable in any context. The attempt to provide a uniform curriculum and uniformly adequate facilities would be part of any rational school program. Indeed, providing equal curricular offerings and equal facilities is part of the provision of equal educational opportunity to all students, and thus is not only desirable and rational, but constitutionally required.

██ However, the court finds that locating a school within the general area of each child's residence serves no compelling educational objective which supersedes constitutionally protected rights.[19] One apparently attractive objective the neighborhood school policy does seem to serve is the minimization of inconvenience.

A brief examination of the maps showing 1970 elementary attendance

---

19. See further discussion, infra, at 199–201.

zones reveals that the general and subsidiary standards of Kalamazoo's "neighborhood school policy" were inconsistenty applied. Elementary school attendance boundaries, sometimes following prominent natural or artificial features and sometimes not, form a bewildering variety of geometric shapes and sizes. The map overlay exhibits reflecting circles ½ mile in radius, corresponding to the walking distance figure referred to by the defendants, reveal substantial overlap and little correspondence to actual attendance boundaries. It is apparent that Kalamazoo elementary schools were not situated and boundaries were not drawn in a fashion which regularly placed students in the schools closest to their homes.

Moreover, the stated ideal elementary school size of 13 classrooms (2 classrooms for each of 6 grades, plus one kindergarten room) was not regularly followed. Of 25 regular elementary school buildings in use in 1969, only 3 had 13 grade and kindergarten classrooms. Eleven schools had more than 13 grade and kindergarten classrooms, and 11 had less. The largest school was Woodward, with 24 such rooms, and the smallest school was Hillcrest, with 7. The average size of the 25 schools was 14 grade and kindergarten rooms.

One elementary school, Chime, which served a largely rural area, had an attendance zone almost as large as that served by all the other schools combined. In 1969, it had 16 grade and kindergarten classrooms, making it more than twice as large as the smallest school in the system. In addition, Kalamazoo has operated a variety of programs for special need programs that have taken students to schools far from their homes. The point is not simply that Chime and the special programs are inconsistent with the general neighborhood policy, but that the Kalamazoo board has so easily ignored the whole concept. Were the neighborhood school educationally necessary, Kalamazoo would have long since taken steps to disperse Chime and to bring special services to the students.

Neither junior nor senior high schools in Kalamazoo serve "neighborhoods" in the commonly understood meaning of that term, since the attendance zones are so large. Rather, Kalamazoo has dispersed its junior high schools around the periphery of the district, having one each in the northwest, southwest, southeast, and northeast, and an additional junior high in the south central portion of the city. There are only two senior high schools in Kalamazoo, one being located until January 1972 just south of the main business district near the center of the district's population, and another at the extreme southern edge of the district.

The statistics concerning the Kalamazoo board's transportation of students before the May 7 plan provide further evidence not only of the inconstancy of application of the "neighborhood school policy," but also of the ease with which the public schools have accommodated the many departures from the "neighborhood school" concept. In September 1967, the Kalamazoo board decided to transport at public school expense each student who lived more than a mile and a half from school. Some transportation was provided by the public schools, and some by the city bus line under contract with the board. According to the board's statistics, a total of 1155 public elementary school children, or 11.7% of the total, were transported at district expense for reasons other than safety or desegregation during the 1970–71 school year. In 1970–71, the board also transported 1527 public junior high students, about 39% of the total, for reasons other than safety or desegregation.

■ On the basis of even this cursory view of a very small amount of the evidence presented in this case, this court cannot conclude that the Kalamazoo school board resolutely and consistently followed a "neighborhood school policy." "Policy" is taken here to mean

not merely what is actually done, but rather a set of general goals which are adopted for governmentally legitimate reasons, which bear a rational relation to the functions to be served, and which are routinely and consistently followed, unless a sufficiently compelling reason appears for departures in individual cases. The alleged "policy" has been too often departed from to have been a firm and consistent goal of the Kalamazoo board.

This court would be the last to minimize the complexities and difficulties of administering a school system. Were it not for the element of race, the court might conclude that the Kalamazoo board simply coped with problems as they arose, making attempts to relate them to stated goals, but in practice doing ultimately what seemed acceptable at the time. But the element of race is present in Kalamazoo, the Kalamazoo schools are segregated, and Black children are being denied equal educational opportunity as a consequence. Although the Kalamazoo Board of Education did not formally and publicly indicate that it was considering race when it made decisions on the matters affecting racial composition of schools, the plaintiffs nonetheless contend that the school board intentionally contributed to the creation and perpetuation of these segregated schools. Indeed, as the parties have stipulated, there is no indication that the Kalamazoo board took any positive action to confront the problem of racial segregation before the late 1960's. Thus, it becomes necessary for this court to explore in more detail the development of the Kalamazoo public schools.

Between 1945 and 1970, there were several types of residential areas in Kalamazoo. The older areas were in the central part of the city. Some of these sections were deteriorating throughout the period, while others were well maintained. Most Black people in Kalamazoo were concentrated in a crescent or arc running from the north central part of the city to the southeast central part. Around the periphery of Kalamazoo, new developments sprang up after World War II which were suburban in character, although they were not far from the central business district. In addition, especially in the 1950's, Kalamazoo annexed many areas which are rural, but are in transit into suburban areas. Most of the people in the new developments and in the annexed areas are White.

The record shows that there was a relatively large number of attendance boundary changes between 1945 and 1970 in the predominantly White areas in conjunction with the annexations and in conjunction with the construction of new school facilities.

However, with a few exceptions noted below, the Kalamazoo school board did not often change attendance boundaries of the schools in the central area of the city. Among the schools whose boundaries were rigidly maintained were those attended by the overwhelming majority of Black children in Kalamazoo. After exploration of all aspects of the Kalamazoo board's practices, some of which are further detailed below, the court has concluded that this rigidification of the boundaries of schools attended by the majority of Black students had the predictable and actual effect of cementing Black students into special areas and particular schools within those areas, and of preserving many other areas and schools for Whites.

Among the matters within the control of the school board are attendance zones. While the board insists that it follows a "neighborhood" school policy, it must be emphasized that generally the board defines the "neighborhood" when it draws the boundaries.

The Kalamazoo board occasionally departed from the policy of rigidly maintaining school boundaries in the area of Black residence by establishing optional attendance zones. One of these was created in conjunction with the closing of Harding Elementary School in 1960. The Harding School attendance area was divided into two sections. One section

in which 15.7% of the households were Black in 1960, was assigned to Edison school. In 1959, Edison was 13.4% Black, while only 7.5% of all students in the district were Black. The second section of the old Harding School attendance area, in which less than 2% of the households were Black, was not assigned to any one school, but made an optional attendance zone. Students could attend Edison, McKinley, which was 1.2% Black in 1959, or Vine, which was 1.4% Black in 1959. While the board might have assigned the optional zone definitely to any one of the three schools, its assignment to Edison would have assigned students from a relatively White area to a relatively (for the time) Black school. Its assignment to Vine or McKinley would have been to assign relatively White areas definitely to White schools, while the relatively Black area had already been definitely assigned to the relatively Black school. In this situation, the choice of an optional attendance zone improved the appearance but had the effect of allowing the Whites in the optional zone the opportunity to *opt out* of Edison and select Vine or McKinley, each of which had fewer Black children. As Dr. Michael J. Stolee concluded, this optional attendance zone "is perhaps the classic use of an optional zone in determining the racial enrollments in schools. . . . ."

Dr. Stolee also stated that three actions taken together—(1) the assignment of that portion of Harding School which had Black residents to Edison, (2) the establishment of the optional attendance zone, and (3) the location of a portable building at the nearby predominantly White Washington school, while there was space available at Edison—indicated that the school authorities had designated Edison as a "Black" school. The court finds that the Kalamazoo board was purposely confining Black elementary children in the south central portion of the city to Edison school.

The school board also created optional attendance zones for some junior high school students. One, between Hillside and Lincoln Junior Highs, was created about 1959 and terminated about 1965. Had the optional zone not been created the students apparently would have been assigned to Lincoln. The purpose and effect of the zone was to allow Whites to avoid attending predominantly Black Lincoln and to attend instead relatively White Hillside.

In 1965, Lincoln Junior High was abolished (although Lincoln elementary remained), and some of the Black students were reassigned to South Junior High. An optional attendance zone had been created in 1959 between South and Milwood Junior Highs in a largely White area. With the increased number and proportion of Blacks at South in 1965, the decision to continue the optional zone was very significant. Although the White students might have been assigned to Milwood, the retention of the optional zone improved the appearances, but again had the effect of allowing White students to opt out of relatively Black South in favor of largely White Milwood.

In other instances, the Kalamazoo board's change of boundaries had the long term purpose and effect of confining Black students to a predominantly Black school. In 1947 and 1953, the board adjusted the boundary between disproportionately Black Roosevelt and virtually all White Wilson elementary schools. While the immediate short term effect of these changes was to insignificantly dilute the Black proportion of Roosevelt, the more significant and clearly predictable long range consequence was to assure that Blacks entering this racially changing area would still attend Roosevelt.

The Kalamazoo attendance boundary policies cannot be fully understood except in relation to the equally important matters of new school construction and attendant site location policies, especially in the 1950's and 1960's. Kalamazoo was growing in the early 1950's, and the existing Kalamazoo facilities were becoming severely strained. In March 1954, the Kalamazoo Public Schools pub-

lished their projected school housing needs until 1960–61. The document reveals comprehensive analysis of the apparent future need for new classrooms and schools, and was obviously intended to be in the nature of a long range plan. It was not, however, rigidly adhered to. While some of the detailed proposals were later implemented, some were not.

The determination of the location of schools is a very important function of local school authorities.[20] Over the long run, the consequences of choice are far-reaching to all affected. Thus, site selection is ordinarily a complicated affair, ultimately implicating the major dynamic forces in the community. In the community of Kalamazoo, responsible school authorities informally receive a great deal of advice from private individuals and interest groups. The school board also established formal, public contacts with the rest of the community through citizens' advisory committees and formal consultations with private groups.

In the late 1950's and the early 1960's the Kalamazoo board regularly consulted with public citizens' committees on various aspects of the problems of locating and constructing new schools and remodeling old ones. Since the advice of these committees was not always followed, and since official minutes usually do not reflect full discussion or debate, the minutes and committee reports cannot be said to accurately reveal the true reasons for the board's selection of particular locations.

In the middle 1950's, the Kalamazoo Board of Realtors was one private interest group with which the Kalamazoo Board of Education established an especially close relationship on the matter of school site selection and new school construction. Apparently this was in part a manifestation of a traditional policy, since there is evidence that the school board consulted with leading realtors on these matters as early as the late 1920's. In June 1955, Superintendant of Schools Loy Norris wrote to the Chairman of the Kalamazoo Board of Realtors proposing that the Public Schools and the Board of Realtors jointly "develop a policy" concerning school sites in the new residential developments. The letter said, in part:

"You perhaps are aware it is frequently the case that a new school opens up an entire new development in residential construction. I am wondering whether we could not develop a policy between us and the Real Estate Board whereby you would actually provide for a school site in a new development and get in touch with us to ask whether or not we would be interested in securing the site. As it now is, and has been in the past, developers often feel that we are a considerable nuisance—and maybe rightly so—when we insist upon buying the site in the new development. It is said that building a school will devaluate adjacent residential property. Also, when a new development opens we find it necessary to pay two or three times what the developer paid for the property when it was opened up. This is tax money which comes from you people as well as from your fellow citizens."

The Board of Education also thought that cooperation with the realtors would be desirable, and requested the Board of Realtors to appoint a special committee. Mr. David R. Satin, then President of

20. The primary authority to locate schools is given by statute to the local boards. M.C.L.A. Sec. 340.113; M.S.A. 15.3113. All plans and specifications for the construction or remodeling of any school building or addition must have the approval of the State Board of Education or its agent. M.C.L.A. Sec. 388.851; M.S.A. 15.1961. The statute directs the State Board to consider matters of health, fire and safety. Between 1949 and 1962, the Superintendent of Public Instruction was also required to consider the "adequacy and location" of a school site. Mich.Public Acts of 1937, Act No. 306, Sec. 1, as amended by Mich. Public Acts of 1949, Act. No. 231. The provision requiring the Superintendent to consider the adequacy and location of school sites was repealed by Mich. Public Acts of 1962, Act. No. 175.

the Board of Realtors, appointed a committee, which became known as the School Sites Committee, to meet with the school authorities. One such meeting was held at the Elks Temple. Although the School Sites Committee was at first apparently to consult only on school construction in new residential areas, the Committee soon offered its services in conjunction with school site problems generally. In the late 1950's, the Kalamazoo Board of Realtors and its Committee also offered their favorable opinion on the suitability of a site for a new administration building, their unfavorable opinion on the proposed site for a new library, and their advice on appraising and the mechanics of purchasing school sites. Subsequently, in a manner to be explained more fully below, the Board of Education went into an extraordinarily close relationship with Mr. David Satin, former President of the Board of Realtors, in the development of the Arcadia section in the southwestern part of the school district.

The position of the real estate industry on the general issue of open housing since World War II is a matter of public record, and has been summarized, with reference to supporting exhibits, in the stipulations by the parties. The Code of Ethics of the National Association of Real Estate Boards, Art. XXXIV, included in Kalamazoo Board of Realtors, By-Laws, Code of Ethics and Multiple Listing Regulations for both 1945 and 1950 provided:

"A Realtor should never be instrumental in introducing into a neighborhood a character of property or occupancy, members of any race or nationality or any individuals whose presence will clearly be detrimental to property values in the neighborhood."

While the race and nationality parts of the Code of Ethics were removed after 1950, the exact date of which is unknown, the real estate industry has consistently allied itself with those private persons and property owners who wished to discriminate on the basis of race in the sale or rental of housing and

has consistently opposed any legislation or other public measures which would affect the operation of the private market in such a way as to reduce segregated housing in Kalamazoo or elsewhere.

The Kalamazoo Board of Realtors represented only one dynamic force among many in the community which ultimately affected school board decisions on the selection of sites and the construction of new schools. However, the court finds that the association between the two groups has probative value in assessing the actions of the Board of Education in the 1950's and 1960's. In the community of Kalamazoo, the school authorities, including the members of the school board, were certainly aware of the position of the Board of Realtors and many individual realtors concerning measures which would operate in a practical way to reduce segregated conditions in Kalamazoo. Where the foreseeable and actual effect of the school construction program of the 1950's and 1960's was to contribute substantially to the creation and maintenance of segregated schools and neighborhoods, the school board's close association with a private group such as the realtors must be considered in evaluating the results of the school board's actions.

On June 1, 1956, the Kalamazoo voters approved a millage and bond issue totaling nearly $15,000,000 and permitting a continuing program of construction in the Kalamazoo School District. One of the areas affected by the new construction was the northern section, referred to in the testimony as a "pie," which contained most of the Black elementary schools in the district and which was served, in the late 1950's by three elementary schools, Lincoln, Woodward and North Westnedge. The boundaries in this area had remained relatively stable since 1945. In 1959, Lincoln was 62.2% Black, Woodward was 1.3% Black, and North Westnedge was 22.1% Black. The attendance zones of Lincoln and North Westnedge were rectangular, with the elongated portion running in a

north-south direction. This was true to a lesser extent of Woodward. North Westnedge was old and thoroughly inadequate by the late 1950's and had to be phased out.

The school board, apparently following a detailed recommendation of Superintendent Norrix, built a new school, Northglade, at the northern border of the district almost due north of old North Westnedge school. Northglade was opened in 1959 and North Westnedge closed by 1962. In conjunction with the opening of Northglade and the establishment of boundaries for that school, new boundaries were set for Woodward and Lincoln. Northglade was given rectangular boundaries, with the elongated part running east and west. Northglade took about the north one-half of Lincoln, the north two-thirds of old North Westnedge, and a northerly sector of Woodward. Although precise racial statistics are not available for 1959, it appears that these and other boundary changes inside the "pie" area operated to reduce Black and White racial concentrations in Lincoln and Woodward. In 1959, 26.3% of the households in the Northglade service area were Black, so it is reasonable to infer that Northglade was racially identifiable when it opened.

The court concludes that the net effect of the closing of North Westnedge, the location, construction, and opening of Northglade, and the accompanying boundary changes was to greatly fortify the unaltered exterior boundary of the combined Lincoln-Northglade-Woodward attendance area, especially on the western side. The foreseeable and actual effect of this phase of the Kalamazoo program was to contain the future growth of Black elementary student population on the north side in these three schools. By 1969, Woodward was 53.8% Black, Northglade was 87.2% Black, and Lincoln was 95.6% Black.

Indeed, as Dr. Stolee testified, there was "no compelling reason" why Northglade had to be constructed where it was. Locating the school within the same rigid boundary line, in Dr. Stolee's words, "almost guaranteed the continuing racial identifiability" of Northglade. Furthermore, the shifting of boundaries within the Lincoln-Northglade-Woodward area could make no difference in the long run, since cutting the pie into three pieces in almost any direction would result in three racially identifiable schools. The reduction in racial concentrations at Lincoln and Woodward in 1959 was of only temporary and marginal significance.

The court notes that the Kalamazoo board was not simply replacing North Westnedge with Northglade, but that there were many rational alternatives presented to the board by the extensive construction projects in the area. Slightly more than two miles to the west of Northglade, the school board also built the new Indian Prairie elementary school in 1959. Predictably, Indian Prairie was predominantly White when it opened, and it has remained predominantly White. The board also opened Winchell, another predominantly White elementary school, in 1959 in the southwest section of the district. As Dr. Stolee suggested these projects afforded numerous opportunities in the late 1950's for changes in attendance zones which would not have had the effect of perpetuating segregation.

The court finds that the school board, unchecked by the supervisory authority of the State Board of Education, intentionally created, maintained and perpetuated segregated schools in the north and northwest areas by deliberately pursuing construction and boundary policies which resulted in confining Black elementary students to the Woodward-Northglade-Lincoln area, and which at the same time resulted in creating and preserving the Indian Prairie school and attendance area for an overwhelmingly White student body. In the language of Keyes, supra, the Kalamazoo board located both Northglade and Indian Prairie with "conscious knowledge"

that they would be segregated schools. 303 F.Supp. at 285; 413 U.S. at 201, 93 S.Ct. at 2694.

The Kalamazoo Board of Education not only confined Black elementary students to selected areas and schools, and acted to preserve other areas and schools for Whites, but it also became associated with a realtor in the development of a new, predominantly White, subdivision.

On December 2, 1957, it was reported to the Board of Education that Mr. David Satin was willing to sell a site of ten acres for use as a future building site for an elementary school in the Arcadia Plat he was developing. The Arcadia Plat was substantially underdeveloped in 1957. Mr. Satin was instrumental in establishing the Realtors' School Sites Committee and in fostering cooperation between the Board of Education and the Board of Realtors. The combined School Board-Satin project was apparently among the first practical results of the new intimate association. After investigation, the School Board decided to buy the proffered lot for $20,000.

In 1960, the Board of Education agreed with Satin's request that he be permitted to place a sign on the site, which would inform the people coming into the area that this was a future elementary school site.

The developers also ran advertisements in the Kalamazoo Gazette designed to indicate to prospective buyers that Arcadia was intended to be mostly White. Arcadia was represented as being "Refined—a refined neighborhood for fine people," and "Discriminating—yes, discriminating buyers will stop looking after seeing the display homes in Arcadia priced from $23,900 including large lot." Later, the developers also ran ads in the Kalamazoo Gazette informing the public that the new homes

for sale were located near the new Arcadia elementary school.

With considerable help from the FHA,[21] Mr. Satin sold so many homes in Arcadia that the new elementary school had to be built very soon. It opened in 1964, and because of further growth, additions were made in 1965, 1966 and 1969. Relocatable classrooms were added in 1969 and 1970.

Arcadia School opened as a predominantly White school in 1964. (Although precise racial figures for 1964 are not available, the 1967 statistics indicate that Arcadia had only 5 Black students out of a total of 313, or about 1.6%). While there is evidence in the record to indicate that the school board had cost considerations in mind when it purchased the Arcadia plat, these considerations were apparently cast aside when the board allowed Satin to publicly exploit the planned school for the purposes of speeding development.

Nor since the board assisted in the Arcadia service area, can it be credibly claimed that the board was merely erecting another school to service a pre-established neighborhood. Moreover, the board members must have been aware that the neighborhood they were helping to create would be predominantly White. Geographically, the Arcadia plat was far removed from any area of substantial Black population, with Western Michigan University being between Arcadia and the center of Kalamazoo.

The board's Arcadia project was an outgrowth of close association between the school board and the Board of Realtors, whose public stand in favor of discriminating property owners and against any effective, affirmative state or local action which would open the real estate market to Blacks was well known. Mr. David Satin ran careful advertisements

---

21. The FHA was definitely involved in the early development of Arcadia. It is estimated that the FHA became involved in the early 1960's with about 90% of the mortgages being underwritten in the Arcadia and Arcadia #1 Plats. Letter from Mr. Alfred Raven, Director, Grand Rapids Insuring Office, Federal Housing Administration, Department of Housing and Urban Development, to Howard and Howard, Attorneys, Aug. 13, 1973, added to evidence by Stipulation of the parties filed Sept. 17, 1973.

172

to indicate that the neighborhood and its neighborhood elementary school, were intended to be predominantly White. The new Arcadia homes sold for $23,900, and up, a relatively high price for the early 1960's. In such circumstances, the Arcadia development could not fail to draw relatively affluent Whites away from older, central areas of Kalamazoo

Thus, in light of all the entire relevant history surrounding Arcadia, the court concludes that the school board intended that Arcadia elementary school be opened as a predominantly White school. The circumstances surrounding the planning and construction of Arcadia school show that the Kalamazoo Board was not only acting to perpetuate the segregated character of Kalamazoo schools, but was also intentionally acting in such a way as to promote and create a segregated residential pattern. When the school board combines with real estate developers in such a way as foreseeably and actually to create a new predominantly White neighborhood school, it cannot be heard to say that it is merely applying a racially-neutral neighborhood school policy throughout the district.

The whole pattern of construction of elementary schools in the north, northwest, west and southwest in the late 1950's and early 1960's may be considered as a whole. Northglade was built in a transitional area, was opened in 1959 as a racially-identifiable school, and by 1969 had become 87.2% Black. All other schools built in the north to southwest arc during this period were in predominantly White neighborhoods, which remained predominantly White in 1969: Indian Prairie (1959), Grand Prairie (1958), Arcadia (1964), Winchell (1959), Oakwood (1963). Viewing these facts in light of the particular circumstances recounted above and in light of the general rigidity of school boundaries in Black residential areas, the court concludes that the Kalamazoo Board of Education deliberately pursued the policy recognized as a foreseeable possibility in Swann, supra, of building many new schools:

"[I]n the areas of white suburban expansion farthest from Negro population centers in order to maintain the separation of the races with a minimum departure from the formal principles of 'neighborhood zoning.' *Such a policy does more than simply influence the short-run composition of the student body of a new school. It may well* [and did in this case] *promote segregated residential patterns which, when combined with 'neighborhood zoning,' further lock the school system into the mode of separation of the races.*" 402 U.S. at 21, 91 S.Ct. at 1278. (Emphasis supplied.)

The findings thus compelled by the record on this subject, therefore, at least parallel and probably exceed the observation of the Sixth Circuit Court of Appeals, affirming the District Court's findings of state responsibility for school segregation in Pontiac, Michigan, "that school location and attendance boundary line decisions, for the past 15 years, more often than not tended to perpetuate segregation." Davis, supra, 443 F.2d at 576.

Other aspects of the Kalamazoo board's construction policies, when coupled with the general policy of maintaining rigid boundary lines in Black residential areas, contributed to the creation, maintenance and perpetuation of segregated conditions in Kalamazoo elementary schools. When population pressures were felt within a school service area, the board often added permanent classrooms, or after 1966–67, portable classrooms.

The school board followed a policy of using permanent and portable classrooms in both Black and White schools, with the net effect of retaining Blacks in the Black schools and Whites in the White schools. Thus, a part of Kalamazoo's construction program in the late 1950's was a virtual rebuilding of Edison School. Edison had been originally

built in 1880, and many additions had been made, including substantial ones in 1889 and 1923. The older part of Edison was razed in 1958 at the direction of the Fire Marshal. The addition of twenty-two classrooms in that year brought Edison's total capacity up to thirty-one. With a student population of 13.9% Black in a school district 7.5% Black, Edison was racially identifiable in 1959, and has remained disproportionately Black, having the fifth highest concentration of Black elementary students in the district. Despite the fact that most other elementary schools built in the late 1950's were designed to conform to a standardized size of thirteen classrooms, Edison was constructed sufficiently large—more than twice the size of the standard—to house all of the students living in the only attendance zone in the city's southeastern side containing significant numbers of Blacks. The further addition of four classrooms in 1969 simply augmented the effect of the board of education's construction policy at Edison. Blacks living in the old Edison area were contained in the Edison school, while contiguous schools to the immediate west, south and east were maintained as disproportionately White.

Edison's 35 classrooms are situated on a site of only 7.22 acres which is shared with a Boys Club facility and a school district maintenance building. The size of this site is roughly equivalent to the size of sites entirely available to schools approximately one-third as large as Edison.

Lincoln School, which has the highest proportion of Black students of any school in the system, was frequently remodeled and maintained, often at the direction of the Fire Marshal, in order to keep its 52 classrooms available for inner city Blacks.

Northglade School, 79.5% Black by 1967, received four portable classrooms in 1967 and 1970 to supplement its thirteen previously constructed rooms. Woodward, the third blackest school, also the object of remodeling inspired by the Fire Marshal, was expanded to 28 classrooms in 1961 in order to house growing population within its attendance zone.

The use of additions to reinforce old segregation-producing attendance zone boundaries was not confined to Black schools. For example, the record shows that the board added permanent or portable classrooms to predominantly White schools at times when there were vacancies in disproportionately Black schools. Dr. Stolee testified that after space became available at Edison, an elementary school which had a higher proportion of Black students than the proportion of Black students in the whole system, the school board added a relocatable classroom at nearby relatively White Washington rather than change boundaries.

Dr. Stolee further testified that his examination of school board records revealed that there were never less than 1,057 vacant spaces in Lincoln, Northglade, Roosevelt and Woodward Schools during the years 1961 to 1970, and sometimes more than this number of vacancies.

While the court agrees with the defendants that the precise number of vacant spaces is difficult to determine, it appears that at all times from 1961 to 1970 there were a substantial number of vacancies in the four downtown schools. The board's addition of permanent and portable classrooms to White schools while there was a significant amount of space in racially identifiable Black schools had the obviously foreseeable and actual effect of perpetuating the segregated conditions which prevailed.

The Kalamazoo board also operated several "primary units," small buildings designed to accommodate only the lower elementary grades, kindergarten through third. At least three of these units, Peter Pan (1955), Pleasant Park (1958), and Fairview (1960), were erected by the board within existing attendance zones along the White outer periphery of the district to relieve overcrowding. Each remained virtually all White throughout the period of its use up to

1970. Once again, the positioning and use of these new facilities effectively obstructed the intermingling of Black and White students. By locating relief classrooms for overcrowded White schools in this manner, the Kalamazoo board preserved the White character of the schools affected.

While the Kalamazoo board has contended that many of the additions accomplished the result of bringing inadequate annexed schools up to the Kalamazoo district's standard size of 13 classrooms, the record reveals a disturbing number of instances wherein this goal was applied inconsistently. The board's approach to Edison provides but a single example. Arcadia school, newly built well after the standard size facility had been targeted, received 4 additional portable classrooms even after permanent construction of 14 classrooms. Chime, a White school serving such a wide attendance area as to negate even the most expansive definition of a "neighborhood" school, received additions elevating its capacity to 17 classrooms by 1964. Installation of two more portable rooms in 1969 and 1970 further expanded the size of Chime.

Also indicative of the inconsistency of the board's effort to achieve the standard 13 classroom size for its elementary schools is the pattern of development of virtually all White Washington school. Originally built in the early 1920's as a rather large school, capable of absorbing junior high as well as elementary pupils, Washington received an addition in 1963, leaving it with 25 classrooms. Notwithstanding the fact that this resulted in a school twice the standard size, Washington was further enlarged by installation of a portable classroom in 1966.

 Of course, individual decisions to adjust to population trends and educational needs by installing facilities on existing school sites cannot, of themselves, be objectionable. However, a persistent pattern of instituting major adjustments in a way which necessarily fortifies barriers to the intermingling of the races is worthy of careful scrutiny by this court, in light of the severe educational detriments which flow from a racially segregated learning environment.

 The final aspect of the board's construction record which bears consideration relative to its elementary schools is the physical comparability of these facilities. Of the five Black schools, only one, Northglade, really compares favorably to many of the facilities attended predominantly by White children. This was a reasonably foreseeable consequence of the board's actions and inactions and, therefore, intentional.

The oldest elementary school building in Kalamazoo is Roosevelt, which still stands essentially as it was constructed in 1909. In 1969 Roosevelt was the district's fourth blackest school, with 38.8% Black students. Woodward, serving a 53.8% Black student body in 1969, was originally built in 1921, one year earlier than Lincoln. Both Woodward and Lincoln have been the object of repeated concern on the part of the Fire Marshal, as discussed previously. While several predominantly White schools also date back to the 1920's, they generally, with the exception of Washington, do not contain the large number of classrooms found in these Black schools. Edison school is another school with a history of substantial Black attendance which is disproportionately large relative to most other elementary facilities in the district.

Kalamazoo board member, Edward Thompson, perhaps provided the most accurate summary of the board's boundary and construction policies: "We all know what the results were. The results were that the old schools were left to the Blacks."

Like most school systems, Kalamazoo has always had fewer junior high schools than elementary schools. The story of the development of Kalamazoo's junior highs since World War II is accurately summarized in the stipulations.

In 1945–1946, Kalamazoo Public Schools operated five junior high schools in facilities which also served elementary students. From 1946 onward, the Kalamazoo Public Schools followed a general policy of establishing separate facilities for secondary school students, and embarked on a program to modernize their junior high schools. With the development of standards and criteria for location and original construction of junior high facilities, no consideration of racial student body composition was made. South Junior High was opened in January 1951 in the south central portion of the district. Northeastern was opened in 1953. Hillside, in the northwestern section of the district, opened in 1959. Milwood School, in the southeastern portion of the district, was a combined elementary junior high when it was annexed in 1956.

Subsequently, in 1959, the new Milwood Junior High was opened. Oakwood, in the southwestern portion of the district, was annexed in 1957. The annexed Oakwood Junior High was small, and from 1957–1959 contained a few elementary classes. In 1959, a greatly expanded Oakwood Junior High was opened, and with the opening of new elementary schools in the area in the same year, the school became devoted exclusively to junior high use. Aside from additions at Northeastern and Oakwood in 1966, the junior high construction program was complete by 1959. In 1959, Northeastern was 9.6% Black; Hillside, 1.8% Black; Oakwood, 100% White; Milwood had 1 Black student; South was 2.6% Black.

With the opening of Milwood in 1959, Lincoln became the only combined elementary junior high facility and the only junior high not built and equipped according to the modernized standards held by Kalamazoo Public Schools. It had 18 junior high classrooms, serving 315 junior high students in 1959.

In 1960, the Fire Marshal found Lincoln School to be in need of considerable fire safety work. The school district decided to remodel the Lincoln Junior High School to meet fire safety requirements necessary to maintain the junior high and elementary facility at Lincoln in the years 1961–1964. Other educational and physical deficiencies at Lincoln were perhaps even more serious. A Citizens Committee reported in September 1963:

> The caliber of instruction in the courses offered at Lincoln is equal to that of the other junior high schools but because of the limited enrollment, students are deprived of the variety of offerings available at the other junior highs. Library facilities are limited and are shared with the elementary school. There is no foreign language program. Offerings in mathematics are extremely limited. Ninth grade algebra is not available every year. The number of elective subjects is also limited. There is only one counselor for the entire student population. This should not be so in an area where counselling is greatly needed.
> * * *
> *Lincoln* is the only junior high school without cafeteria facilities—an area where, perhaps, they are needed the most. The playground is too small and is shared with the elementary school, creating an undesirable situation.
> The Citizens Committee is, therefore, convinced that the students attending *Lincoln Junior High School* do not and cannot under existing conditions receive an adequate junior high school education.

The Committee recommended that the junior high programs at Lincoln be discontinued. This was finally done in 1965. The Lincoln Junior High students were transferred to Hillside and South.

It appears to this court that the Kalamazoo Board of Education deliberately confined the Lincoln junior high students, a substantial portion of whom were Black, to substandard Lincoln facilities and to a substandard educational program from 1958 or 1959 through 1964, when standard facilities

were at all times available. South Junior High had been constructed in 1951, and Hillside was completed in 1958. Kalamazoo's junior high building program was completed in 1959, and there was no more significant expansion between 1959 and 1965. Substantially all the facilities which were available in 1965 were available in 1959 or earlier. Thus, the Kalamazoo Board of Education deliberately denied these students equal educational opportunity and equal protection of the laws within the meaning of the Fourteenth Amendment.

Central was the only high school in Kalamazoo when it became apparent in the 1950's that an additional senior high would be needed. It was understood that a substantial portion of the 1956 bond issue would be devoted to the new school.

Selecting a site was a problem. Some consideration was given to Lincoln School, which had originally been built in 1922 to permit its use as a high school. Perhaps a better option was Upjohn Park which was located in the central southeastern portion of the district and which was available as a possible site for a senior high school. In 1959, Upjohn Park contained baseball and football fields and a field house building in which athletes changed their equipment, and was used for varsity athletics. This site was also considered as a possible location for the new high school.

However, attention was finally focused on the far south side of town, with consideration being given to several sites in that area. The ultimate choice was a far south side site of 55 acres. Since the site was located outside the city limits, it had to be annexed. In contrast to the centrally located Upjohn Park, the selected site was very far from significant concentrations of Black population.

If the far south side site was chosen by the Kalamazoo board with the intention that those living nearest to the new Loy Norrix High School would go there, while those living nearest to Central would continue to go there, then the board clearly intended that the new high school would be predominantly White. Students were permitted to select either Norrix or Central High School in 1960. Most students from the elementary areas containing Black students selected the more accessible Central High School. When attendance boundaries were established in 1961, students residing in all but one (Edison) of the attendance areas of the Black elementary schools were assigned to Central.

Hence, although no specific racial census data is available for 1961, the inference is inescapable that Loy Norrix became a virtually all White school, while Central came to house the bulk of the Black high school student population.

In 1967, the time of the first racial census of record after the opening of Loy Norrix, Central was 15.4% Black, while Norrix was 1.8% Black. In 1969, Central's student body was 19.7% Black compared to Norrix's 1.6%. During this period of the sixties, the parties have stipulated that "Central High School was overcrowded and seen as inadequate by school officials and citizens despite efforts to make its facilities equal to those at Norrix." There is no indication that the school board gave formal and public consideration to a positive program to reduce racial concentrations in the two high schools before 1965. The court concludes that the foreseeable and actual effect of constructing Loy Norrix in the extreme south and of the drawing of the 1961 boundaries was to assure the overconcentration of Black high school students at the old and physically inferior Central High School.

The Kalamazoo Board of Education also contributed to the creation, maintenance and perpetuation of segregated schooling through its teacher hiring and assignment policies. In 1947, the Kalamazoo Board declared that its policy was to choose "all personnel on the basis of character, competence, and training, without regard to color, creed, or national origin." However, by the 1967–1968

school year, only 21 individuals out of a total staff of 1,111, or about 2% were Black. The proportion of Black staff gradually increased thereafter, rather sharply rising in 1969–1970 to 5%, and in 1970–1971 to roughly 7.5%.

In each of the three years 1967 through 1969, Lincoln, Northglade, Woodward and Roosevelt, the four elementary schools having the highest proportions of Black students, contained approximately 85% of all Black elementary students and roughly 63% of all the Black elementary staff in Kalamazoo.

In 1970, the last year preceding the desegregation effort, 80% of the Black students and 80% of the Black elementary staff were concentrated in these four schools. Broken down into figures for individual schools, the record shows a startling direct correlation between racial composition of student body and racial composition of faculty. In October of 1970, of the 30 Black certificated teachers employed at the elementary level, 14, or 46.7%, were assigned to Lincoln, 7, or 23.3%, to Northglade, 3, or 10%, to Woodward, 3, or 10%, to Roosevelt, and 2, or 6.7%, to Edison. Hence, 29 of the 30 Black teachers (96.7%) were assigned to the five elementary schools containing 84.9% of the Black elementary students in the Kalamazoo school district.

A similar pattern was exhibited at the junior and senior high school level. South, Hillside and Northeastern, respectively, enrolled virtually all of the Black junior high students in 1970. 41% of the Black students attended South, 40% attended Hillside, and 14.3% attended Northeastern. Hence, of the five junior high schools in Kalamazoo, these three enrolled 95.3% of the Black pupils.

Likewise, 17 of the 18 Black certificated personnel at the junior high level, or 94.4%, were assigned by the Board of Education to these schools, and, just as was true with regard to the elementary schools, the more Black students at the school the greater was the number of Black staff assigned thereto. Similarly, with respect to the two high schools, Central held 92.7% of the Black students, and 85.7% of the Black high school staff.

This marked direct correlation between racial proportions of students and teachers at all levels of instruction and between all schools at a given level is so pronounced that defendants have not seriously attempted to disclaim that race was a strong factor in the assignment of teaching personnel in the Kalamazoo school district. Indeed, the Kalamazoo board has conceded that, especially during the 1970–1971 school year, Black teachers were deliberately assigned to those schools with a large number of Black children. The alleged purpose was not to further segregate the schools on the basis of race, but rather to provide role models for Black children and to seek to increase communication and credibility of the system with Black students. However, while it is important that Black students be given suitable role models, the Supreme Court has made it clear that this consideration will not outweigh the detrimental effects of state imposed segregation.

School board practices in the area of faculty assignment can be included "among the most important indicia of a segregated system." Swann, supra, 402 U.S. at 18, 91 S.Ct. at 1277. Here, again, a consistent pattern of racial assignment of teachers has been recognized to be a substantial affirmative school board exacerbation of an existing condition of racial identifiability of schools. Kelley v. Guinn, supra. Hence, in determining a school board's constitutional responsibility for racial segregation, "the school district's obvious regard for race in assigning faculty members and administrators is a factor which may be considered." Davis, 443 F.2d at 576.

In the context of this case, where segregated schools existed in 1970 and before, and where the school board had intentionally made substantial con-

tributions to the creation, maintenance and perpetuation of this segregation, the court finds that the deliberate assignment of teachers on a racial basis exacerbated the detrimental effects of state-imposed segregation, and was itself a significant segregative act.

The state and local boards' conscious neglect and inaction in the face of obvious consequences for the Black children of Kalamazoo has significantly compounded the problem of racial segregation in the public schools. In Brown I, supra, decided in 1954, the Supreme Court stated that "in the North segregation in public education has persisted in some communities until recent years. It is apparent that such *segregation has long been a nationwide problem*, not merely one of sectional concern." 347 U.S. at 491, n. 6, 74 S.Ct. at 690. (Emphasis supplied.)

■ In Brown I, the Supreme Court enjoined the enforcement of a Kansas statute which *permitted* but did not require the segregation of elementary schools in certain cities. 347 U.S. at 486, n. 1, 74 S.Ct. 686. State and local school authorities everywhere, including Kalamazoo, were thereby put on notice that the Supreme Court did not regard school segregation as a strictly Southern problem, and that it was unconstitutional for a state, as a matter of policy, to deliberately *permit* segregated public schools.

This court can perceive no essential difference between a state statute which, *permits* local authorities to segregate and a state policy, not expressed in a statute but deliberately pursued over a long period of time which has as its purpose and effect the permitting of local authorities to segregate schools.

■ Similarly, this court can perceive no difference between a local school board which exercises an option to segregate under a statute, Brown I, supra, and a local board which by its deliberate acts and omissions creates or maintains segregated public schools.

■■ In light of the clear notice and requirement of Brown I, where opportunities for positive action are presented, where the consequences of failure to act are clearly foreseeable, and where those consequences are significant contributions to the creation or maintenance of segregated schools, the failure to act is deliberate and intentional. Moreover, if the fabric of the law is to be preserved, if substance is to have meaning beyond form, if the promise of the Fourteenth Amendment is to be fulfilled, then the deliberate failure to act by either state or local authorities must itself be actionable in this court. Plainly, where public issues are framed and questions posed which bear directly on the quality of education, a deliberate negative response from school authorities or a deliberate omission to act, can affect the shape of subsequent circumstances just as materially as can affirmative decisions and action. State responsibility under the United States Constitution must logically be and is fixed in either context. (See Appendix A.)

■ Especially up to 1967, the Kalamazoo board's conscious neglect and failure to act when opportunities presented themselves contributed prodigiously to the growth and maintenance of segregated conditions in the schools. The evidence in this case, and most especially the testimony of Mr. Maynard Morgan, an administrator in the Kalamazoo school system for more than forty years, shows that since 1954, 68 school construction projects and 32 attendance boundary adjustments were made in Kalamazoo. Despite the fact that virtually every such project or alteration potentially afforded an opportunity to confront the inequities which inhere in a segregated situation, defendants concede that at no time before 1966 did the board formally and publicly consider any program, or make any decision, or implement any policy designed to positively confront the problem of racial isolation in the Kalamazoo public schools. This

failure to act was itself a deliberate decision to forego its opportunity to correct the existing segregated conditions and itself was an unconstitutional denial of equal protection of the laws.

Furthermore, the record shows that since 1945, 18 annexations to the Kalamazoo school district were arranged by the board. Each of these annexations added homogeneous White students to the district, and most necessitated boundary adjustments. Although the board exhibited a rigid determination to leave unaltered the boundaries of the inner city attendance zones, deliberate failure to seize the opportunity for adjustment, during a time when changes were necessary anyway, intentionally contributed to the containment of Blacks downtown and intensified racial concentration.

The court has already noted that throughout the latter fifties and sixties, the board was busily engaged in school construction efforts around the geographic periphery of the district which provided facilities for White students. That the placement of these facilities affirmatively served to segregate Whites from Blacks has previously been observed. Equally as consequential, however, was the board's failure during this period to capitalize on classroom space at least potentially available downtown for the newly added White students. While, as noted above, the precise number of vacant spaces and classrooms downtown is difficult to determine, it appears from the testimony of Dr. Stolee that there were a substantial number of vacant spaces and classrooms downtown, and especially in Lincoln, Woodward, Northglade and Roosevelt Schools. Nevertheless, during this period, the Kalamazoo board authorized the new construction of Oakwood and Arcadia schools plus substantial additions at Vine, Washington, Burke, Chime, Grand Prairie, Lakewood, West Main and Winchell, all predominantly White schools. The record also shows that in the cases of Chime and Winchell at least, these additions were not necessary to bring the schools up to the standard size of thirteen classrooms. Furthermore, Superintendent William D. Coats conceded in his testimony that from an educational point of view, there is nothing functionally significant or essential about this size. Hence, all of the construction in the annexed areas deliberately ignored the potential for encouragement of racial integration in the center of the district via creative use of facilities available there.

"[T]here are many places still in this country where the schools are either 'white' or 'Negro' and not just schools for all children as the Constitution requires. In my opinion there is no reason why such a wholesale deprivation of constitutional rights should be tolerated another minute." Justice Hugo L. Black of the United States Supreme Court in Alexander v. Holmes County Board of Education, 396 U.S. 1218, 1222, 90 S.Ct. 14, 17, 24 L.Ed.2d 41 (1969).

On October 3, 1966, the Kalamazoo Board of Education chose to forego another opportunity to alter the course of racial segregation in its schools. Before the board on that day was a resolution endorsing a public referendum to establish a Kalamazoo Housing Commission to consider open housing in the city. After discussion on the public record, however, the board voted to take no position in the matter on the grounds that this was not an issue of educational relevance. For the same board to later contend, as it has before this court, that racial segregation in the schools of Kalamazoo is purely a product of residential patterns over which it has had no influence or opportunity to act is untenable. In the first place, as the court has previously found, school construction policies did palpably influence residential growth in Arcadia and elsewhere. Furthermore, however, the board may not establish uninvolvement in a problem merely by a self-serving proclamation to that effect. Faced with the opportunity to act, the power to exert some influence and the exclusive responsibility to pro-

vide equal educational opportunity, the Kalamazoo Board of Education was active in fostering segregation by the very virtue of the fact that it consciously and deliberately chose for itself a passive role.

The Kalamazoo board further magnified the consequences of and trend toward increasing racial segregation in the schools by failing, at least before 1967, to seek and obtain qualified Black personnel. The record is clear that even at present, minority teachers are severely underrepresented on the Kalamazoo staff, comprising merely 6% to 7% of that staff in a system containing nearly 20% Black students. Before the administration's active recruitment effort of the late sixties, however, the number of Black staff was virtually negligible.

■ The adverse impact which racial isolation has upon Black and White children in terms of unrealistic self-images and detrimental attitudes is only intensified by a conspicuous absence of Black adults in positions of leadership and respect. This paucity of Black administrators and teachers was certainly a foreseeable result of board policies and was attributable to board policies. The damaging effect on students in Kalamazoo of the board's deliberate inaction should be and is a matter within the purview of the Constitution, if that vital document is to be accorded substance.

■ In summary, the court has examined the Kalamazoo board's practices with respect to attendance zones, including the use of optional zones, site location, the construction of new schools, the addition of permanent and portable classrooms, annexations, and the hiring and firing of teachers. Although many of the attendance zone and construction practices have appeared to some to be innocent on their face, and although they have ostensibly been adopted for economic reasons, the court finds that they have been intentionally designed to result in the maintenance of segregated education.

The Kalamazoo School Board's acts of commission and omission clearly demonstrate that the Kalamazoo School Board's administration of the school system substantially contributed to and proximately caused the segregated condition which prevails in the system. From before 1955 through 1969, and into 1970, the Kalamazoo School Board followed a purposeful pattern of racial discrimination which has denied Black children equal protection of the law and violated their fundamental constitutional rights as citizens of the United States to be free from discrimination and to pursue equal educational opportunities. This constitutional violation is independent of and apart from any other state or private institutional acts of discrimination.

The court also finds that the Kalamazoo School Board's discrimination against Black children existed before and at the time of the May 7 school board action to desegregate its dual school system. The May 7 board was, according to the teaching of Brown I, supra, and Brown v. Board of Education, 349 U.S. 294, 75 S.Ct. 753, 99 L.Ed. 1083 (1955) [Brown II], performing its constitutional duty by the creation and implementation of the May 7 integration plan.

### III.

The Kalamazoo Board of Education has contended that segregated schools have resulted from segregated housing patterns. This assertion raises the issue of the causes of housing segregation, apart from school board action, and more specifically, whether the state and its agencies have made substantial contributions to the creation and maintenance of segregated conditions in Kalamazoo, particularly in their relation to segregated schools.

The roots of our present difficulties lie in the existence of slavery before the Civil War. In a "civilized" society, slavery required an elaborate system of rationalizations to support and justify its

existence. Many people, North and South, believed that Blacks were inferior, sub-human and inherently unequal.

The Thirteenth Amendment, passed as a result of the Civil War, abolished slavery, and gave Congress the power to prohibit most discrimination, public and private, against Black people on the basis of race. Congress passed the Civil Rights Act of 1866 (42 U.S.C. § 1982) to, among other purposes, prevent private discrimination in dealings in real property. Unfortunately, this Act was not enforced until very recently. See Jones v. Alfred H. Mayer Co., 392 U.S. 409, 88 S.Ct. 2186, 20 L.Ed.2d 1189 (1968).

The Fourteenth Amendment prohibited state action which discriminated on the basis of race and thus denied equal protection of the laws.

In 1880, the United States Supreme Court in speaking of the Thirteenth and Fourteenth Amendments, stated in Strauder v. West Virginia:

> At the time when they were incorporated into the Constitution, it required little knowledge of human nature to anticipate that those who had long been regarded as an inferior and subject race would, when suddenly raised to the rank of citizenship, be looked upon with jealously and positive dislike, and that State laws might be enacted or enforced to perpetuate the distinctions that had before existed. *Discriminations against them had been habitual.* It was well known that in some States laws making such discriminations then existed, and others might well be expected. The colored race, as a race, was abject and ignorant, and in that condition was unfitted to command the respect of those who had superior intelligence. 100 U.S. 303, 306, 25 L.Ed. 664 (1880). (Emphasis supplied.)

The Thirteenth and Fourteenth Amendments apparently were insufficient to bring equal rights in practice to Black people. The habits of mind which had existed before the Civil War persisted as vestiges of slavery, and many White people continued to regard Blacks as inherently inferior and treated them accordingly. These attitudes gave rise to a number of discriminatory practices, some public and some private, which themselves took on the character of vestiges of slavery.

Among the discriminatory practices which arose was that of attaching racially restrictive covenants to land. The courts in both the North and the South regularly recognized and enforced such covenants. Michigan law is replete with such cases: see Parmalee v. Morris, 218 Mich. 625, 188 N.W. 330 (1922); Porter v. Barrett, 233 Mich. 373, 206 N.W. 532 (1925); Schulte v. Starks, 238 Mich. 102, 213 N.W. 102 (1927); Mrsa v. Reynolds, 317 Mich. 632, 27 N.W.2d 40 (1947); Northwest Civic Ass'n v. Sheldon, 317 Mich. 416, 27 N.W.2d 36 (1947); Sipes v. McGhee, 316 Mich. 614, 25 N.W.2d 638 (1947); Malicke v. Milan, 320 Mich. 65, 77, 30 N.W.2d 440, 32 N.W.2d 353 (1948).

Racially restrictive covenants did not have to appear in every deed in an area in order to produce a segregated neighborhood. It was enough if it was contained in sufficient deeds to indicate a general plan for excluding Blacks from the area. See Schulte v. Starks, supra, 238 Mich. at 106, 213 N.W. at 103:

> "That a portion of the conveyances do not contain the restrictions will not defeat the same. Although some of the lots may have written restrictions imposed upon them and others not, if the general plan has been maintained from its inception, if it has been understood, accepted, relied on, and acted upon by all in interest, it is binding and enforceable on all *inter se.* It goes with the land, and is equally binding on all purchasers with notice."

The callousness of the judicial approach at the time is exhibited by the court's comments in Schulte v. Starks,

supra, 238 Mich. at 105, 213 N.W. at 102:

"The fact that defendants are colored persons is established by their own admissions while on the witness stand and by the finding to that effect by the trial judge who saw them in court. The record does disclose, however, that Mrs. Starks is quite light colored, and she testified that many many times she has been taken for a white woman."

The adjudication process was a simple one. No grave constitutional issues here, no questions of human rights. The only issue was a simple factual one: Are the prospective occupants of the realty black? If they are, the matter is ended. The covenant is enforceable. The mere fact that the Starks were Black triggered a discriminatory practice, upheld and enforced by the state.

Racially restrictive covenants had effects beyond the creation of segregated neighborhoods. When coupled with policies aimed at creating and maintaining harmonious neighborhoods, they inevitably gave rise to the general idea that one could buy a right to a parochial school system carved out of a public system of compulsory " . . . free public elementary and secondary schools as defined by law." [22] Such a notion is an invidious discriminatory result fostered by "State action under color of law."

Racially restrictive covenants have not been the only discriminatory device which grew up after the Civil War. Mere blackness has historically triggered racial discrimination in education, housing, employment, lending institutions, "separate but (supposedly) equal" accommodations, political, social, economic relations, public and private, much of which is "under color of law." To the country's detriment, discrimination became habitual in the North as well as in the South. See Strauder, supra.

In a landmark case in 1948, the Supreme Court of the United States held that enforcement by state courts of racially restrictive covenants was itself state action which violated the Equal Protection Clause of the Fourteenth Amendment. Shelley v. Kraemer, 334 U.S. 1, 68 S.Ct. 836, 92 L.Ed. 1161 (1948). Judicial enforcement of racially restrictive covenants was but another example of the fallacy of "official state" action rationalized to avoid the clear constitutional obligation "to secure equal protection of law" to all citizens. It turns into another vestige of slavery.

However, nationally, the invidious effects of such covenants have persisted into the present to foster and maintain the customary pattern of segregated housing.

There is substantial evidence in the record of the extensive historical use of racially restrictive covenants in Kalamazoo prohibiting sale to and use of property by Blacks. This is particularly true in plats around the perimeter of the city. Significantly, the attendance zones for the Black elementary schools do not contain such covenants with the exception of one in the Woodward area. Many of the covenants appear in deeds in Kalamazoo dated long after the Shelley decision. Covenants continue to appear in abstracts of title and appeared in title insurance policies until 1969 when some Michigan title insurance companies agreed to discontinue their inclusion after requested to do so by the Department of Justice.

The chilling effect of such covenants was furthered by the United States Government through its Federal Housing Administration policies, which fostered segregation. A glaring example is found in explicit provisions of FHA manuals, revised through 1938 and still utilized in the 1950's, which discouraged financing real estate transactions that introduced "inharmonious racial groups" into a community. FHA fostered school segregation by advising in an under-

22. See Mich.Const. of 1963, Art. VIII, Sec. 2.

writing manual that a neighborhood "under consideration will prove far less stable and desirable . . . *if the children of people living in such an area are compelled to attend a school where the majority or a goodly number of pupils represent a far lower level of society, or an incompatible racial element. . . .*" (Emphasis supplied.)

Furthermore, at least through 1948, the Department of Real Estate of the Michigan Corporation and Securities Commission, which was responsible for the licensing and regulation of real estate brokers, published with actual approval the Code of Ethics of the National Association of Real Estate Boards. Article XXXIV of the Code is a specific and unequivocal ethical prohibition against the introduction into a neighborhood of "members of any race or nationality whose presence will clearly be detrimental to property values in that neighborhood." The national code, including Article XXXIV, was included in the by-laws of the Kalamazoo Board of Realtors in 1945 and in 1950.

As late as 1963, the Michigan Supreme Court restrained the enforcement of a rule of the Michigan Corporation and Securities Commission which permitted the revocation of the license of a real estate salesman who practiced discrimination as to prospective purchasers in real estate transactions on the basis of race, color, religion, national origin, or ancestry. McKibbin v. Corp. & Sec. Comm'n, 369 Mich. 69, 119 N.W.2d 557. It is worth noting that Shelley, supra, decided that "judicial act of the highest court of the State, in authoritatively construing and enforcing its laws, is the act of the State." 334 U.S. at 15, 68 S. Ct. at 843.

■■ The record clearly establishes that "state action" contributed to the creation and perpetuation of neighborhood segregation in Kalamazoo. The school board should not be heard to plead that its neighborhood school policy was racially neutral when in fact "state action under the color of law" produced or helped to produce the segregated neighborhoods in the first place. The Michigan courts' decisions in the area of racially restrictive covenants were acts of discrimination which contributed to the segregation of school children in the Kalamazoo system. Shelley, supra. In this respect, the comments of the court in Bradley, supra, D.C., 338 F.Supp. 582 at 587, aff'd on issue of segregation, supra, 484 F.2d 215, are particularly appropriate. The State of Michigan should not be allowed to escape constitutional responsibilities by fractionalizing its jurisdiction through many agencies.

Governmental actions and inaction at all levels, federal, state and local, have combined, with those of private organizations, such as loaning institutions and real estate associations and brokerage firms, to establish and to maintain the pattern of residential segregation throughout the Detroit metropolitan area. It is no answer to say that restricted practices grew gradually (as the black population in the area increased between 1920 and 1970), or that since 1948 racial restrictions on the ownership of real property have been removed. The policies pursued by both government and private persons and agencies have a continuing and present effect upon the complexion of the community—as we know, the choice of a residence is a relatively infrequent affair. For many years FHA and VA openly advised and advocated the maintenance of "harmonious" neighborhoods, *i. e.*, racially and economically harmonious. The conditions created continue. While it would be unfair to charge the present defendants with what other governmental officers or agencies have done, it can be said that the actions or the failure to act by the responsible school authorities, both city and state, were linked to that of these other governmental units. When we speak of governmental action we should not view the different agencies as a collection of unrelated units. Perhaps the most that can be said is

that all of them, including the school authorities, are, in part, responsible for the segregated condition which exists. And we note that just as there is an interaction between residential patterns and the racial composition of the schools, so there is a corresponding effect on the residential pattern by the racial composition of the schools. 338 F.Supp. at 587.

This court, like the Fifth Circuit Court of Appeals, ". . . has carefully considered the Board's claim that its neighborhood school plan was established on a racially neutral criteria and impartially administered, and is therefore, beyond the pale. This contention, that treatment of blacks the same as whites lends a patina of non-segregated responsibility to the system is, when analyzed, not as pristine as it appears. The Supreme Court made it plain in Swann that:

'An assignment plan is not acceptable simply because it appears to be neutral . . . such plans may fail to counteract the continuing effects of past school segregation resulting from discriminatory location of school sites or distortion of school size in order to achieve or maintain an artificial racial separation. When school authorities present a district court with a "loaded game board," affirmative action in the form of remedial altering of attendance zones is proper to achieve truly nondiscriminatory assignments. 402 U.S. at 28, 91 S.Ct. 1267, at 1282, 28 L.Ed.2d 554.'" Cisneros, supra, 467 F.2d at 149.

The May 7 board remedially altered attendance zones and this court simply affirmed its constitutionally sanctioned action.

The fact is that many state, federal and private organizations have made substantial contributions to residential segregation. The Report of the Senate Select Committee on Equal Educational Opportunity summarizes:

"B. The Causes of Residential Segregation.

As in the case of school segregation, housing segregation is seldom a matter of individual choice. It is clear that Federal, State and local governmental practices, at every level, have contributed to the housing segregation which exists today. These actions combine with those of private organizations such as lending institutions, real estate brokerage firms, land developers and others to estabish and maintain residential segregation." [23]

In his testimony before the Select Committee, George Romney, then Secretary of the Department of Housing and Urban Development, placed these matters in historical perspective. The answer, he said, lies in

"our country's tormented history of race relations. . . . Throughout most of that history, *the dominant majority supported or condoned social and institutional separation of the races. This attitude became fixed in public law and public policy at every level of government and every branch of government*, and thus it was adopted as a matter of course by the Federal Government when it entered the housing field in the 1930's. It continued after World War II." [24] (Emphasis supplied.)

Secretary Romney described the dynamic forces which exist in metropolitan cities, the state and the nation. These forces conjoin, comingle, interreact and substantially cause and contribute to discriminatory segregation of housing and schools. The Kalamazoo school board and the State Board of Education in Kalamazoo functioned within the framework of residential segregation, and interreacted with these dynamic community forces. The record shows that the Kalamazoo board and its agents at all times had intimate knowledge of the location, size and evolving character of each residential area in Kalamazoo.

23. S.Rep.No.92-000, 92D Cong. 2d Sess. 121-122 (1970).

24. Id. at 2775.

The record further shows that the board maintained constant formal contact with the community at large through various citizens groups and with important private interest groups such as the Board of Realtors. The school board members themselves were community leaders, lawyers, bankers, academicians, industrialists, and the like, who were active in civil affairs and who had extensive personal knowledge of Kalamazoo and the way that public agencies and private groups functioned in the city.

There are often multiple causes of a situation which deprives Black children of equal opportunities, and each cause, if it has a significant impact, will be in fact and law a contributing cause. When the action of many state agencies other than school authorities contributes to the creation and maintenance of segregated housing, and when the school authorities deliberately set attendance zones along "neighborhood" lines, then, as the Fifth Circuit has observed, "we are faced with *double* discrimination." Texas Education Agency, supra, 467 F. 2d at 863, n. 22.

In this case, the actions of multiple state governmental bodies, many of them apparently in violation of the Constitution, joined with actions of a similar character by federal agencies and with the actions of private institutions to produce segregated conditions in Kalamazoo.

The fact that many public and private institutions made deliberate and substantial contributions to neighborhood and school segregation in Kalamazoo does not excuse the State Board of Education, the Superintendent of Public Instruction, and the Kalamazoo Board of Education from liability for their violation of the Constitution of the United States and the Constitution of the State of Michigan. The State of Michigan cannot parcel out its jurisdiction and deliberately achieve by bits and pieces what it could not do directly by statute. When such a situation is alleged to exist, the court must look closely at the actions of each agency to determine whether it has met its constitutional responsibilities. To allow each agency to plead constitutional violations of other agencies in exculpation of its own, would be to mock the Constitution of the United States and the Constitution of the State of Michigan.

Judge Edwards in the Nashville Board of Education case stated:

"The Constitution of the United States was written for one nation, 'indivisible.' As it speaks to men's consciences, the Constitution argues against division and apartheid.

"In the public domain, however, the Constitution commands. Here the constitutional command is One America." Kelley v. Metropolitan Cty. Bd. of Ed. of Nashville, Tenn., 463 F.2d 732, 746 (6th Cir. 1972).

### IV.

Notwithstanding all of the deliberate overt actions and damaging consequential omissions on the part of the state and local defendants before 1971, the direct consequences of both the July 6, 1971 local board ,resolution and the occurrences which specifically preceded it lay the most concrete uncontroverbable predicate for the grant of equitable relief which plaintiffs seek. In order to appreciate the significance of the state activities in the field of student racial dispersion and to understand the full meaning of the July 6 action, it is necessary to trace the accelerating progression of events in the State of Michigan which culminated in the May 7, 1971 fruition of the Kalamazoo desegregation commitment.

The response of the State authorities to segregation in Michigan public schools has been spotty and generally ineffective. The Michigan Constitution of 1908 gave the Superintendent of Public Instruction "general supervision of public instruction in the state." Art. XI, Sec. 2. Following the decision of the Supreme Court in Brown I, supra, the Superintendent of Public Instruction re-

viewed various complaints requesting his assistance in preventing the establishment of racially identifiable schools. These complaints emanated from local branches of the NAACP, on behalf of Black children and their parents, in the cities of Grand Rapids, Pontiac and Benton Harbor. The Superintendent refused to act on these complaints on the ground that he had been advised by the Attorney General that he had no authority to act.

This refusal was effective notice to the local school districts throughout Michigan, including Kalamazoo, that even though any actions taken by them intentionally created or perpetuated identifiably Black schools, they need not be concerned with the Superintendent of Public Instruction even though his office was charged with supervision and leadership of public education in Michigan.

In Kalamazoo, and elsewhere, the period between the decision in Brown and the adoption of the new state constitution in 1963 was an extremely active period in terms of school construction, annexation, and boundary change. The response of the Superintendent to the segregated school problem during this period was for all practical purposes to turn a deaf ear. Had he, following the decision in Brown, required that no action be taken which created or perpetuated segregated schools, much of the segregation in schools in Michigan which the Federal courts have been called upon to remedy in recent years could have been avoided.

In 1963, the people of Michigan adopted a revised Constitution which included a number of provisions guaranteeing civil rights and prohibiting discrimination on the basis of race. These provisions were included partially in response to the civil rights movement which reached its height in the early 1960's, and were clearly intended to be both an implementation of the Fourteenth Amendment, as interpreted by the United States Supreme Court in Brown I, supra, and other decisions, and an independent guarantee of the civil rights of Michigan citizens.

The elected delegates to the Constitutional Convention of Michigan in 1961 and 1962 prepared a report to the people of Michigan in accordance with the requirements of Act No. 8 of the Public Acts of 1961, section 168.181 of the Compiled Laws of 1948, which reads in part as follows: "The convention shall, before its adjournment, prepare and adopt an address to the people of the state, explaining the proposed changes in the present constitution, and the reason for such changes, and such other matters as to the convention shall seem advisable. Not less than 25,000 copies of this address, in pamphlet form, containing the full text of the revised constitution, shall be printed and distributed as the convention shall direct." The document was entitled "What the Proposed New State Constitution Means To You."

Under each section of the proposed Constitution is an explanatory statement of that section. "Article VIII, Education, Sec. 2," and its explanatory note are as follows:

"Sec. 2. The legislature shall maintain and support a system of free public elementary and secondary schools as defined by law. Every school district shall provide for the education of its pupils without discrimination as to religion, creed, race, color or national origin. * * *

\* \* \* \* \* \*

The anti-discrimination clause is placed in this section as a declaration *which leaves no doubt as to where Michigan stands on this question.*" [25]

(Emphasis supplied.)

This report was widely circulated. It was made available to all governmental agencies, the State Bar, and the general

25. Michigan Constitutional Convention of 1961–62, "What the Proposed New State Constitution Means To You," 77 (1962).

public. It received considerable mass media coverage, of which this court takes judicial notice.

These sections were written with several things in mind: the history of slavery, slave trade, race relations, civil rights, the Brown decision, and the then immediate dilemma in desegregation of southern schools. The delegates wanted to make it crystal clear what the people of Michigan were voting for when they adopted the Constitution.

The education provision was a specific application of the more general equal protection clause included in Article I, Sec. 2. The delegates noted that the "principal, but not exclusive, areas of concern are equal opportunities in employment, education, housing and public accommodations." [26] Finally, the State's commitment to equal opportunity was given further substance by the creation, by Article V, Sec. 29, of a new Civil Rights Commission with a duty to investigate alleged discrimination and to secure the equal protection of civil rights without such discrimination.

■ The civil rights sections of the new Constitution were Michigan's implementation of the Fourteenth Amendment of the United States Constitution. These provisions of the state Constitution should be interpreted in accordance with the language of Strauder v. West Virginia, supra, when that Court spoke to the interpretation of the Fourteenth Amendment:

> "If this is the spirit and meaning of the Amendment, whether it means more or not, *it is to be construed liberally,* to carry out the purposes of its framers. * * * The words of the amendment, it is true, are prohibitory, *but they contain a necessary implication of positive immunity, or right, most valuable to the colored race,*—the right to exemption from unfriendly legislation against them distinctly as colored,*—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race." 100 U.S. at 307, 25 L.Ed. 664, cited in Brown I, supra, 347 U.S. at 490, no. 5, 74 S.Ct. 686. (Emphasis supplied.)

Justice Brewer asserted that the Declaration "is the thought and the spirit, and it is always safe to read the letter of the Constitution in the spirit of the Declaration of Independence." Gulf, Colorado & Sante Fe Ry. v. Ellis, 165 U.S. 150, 160, 17 S.Ct. 255, 258, 41 L.Ed. 666 (1897).

In addition, the State Board of Education and the State Superintendent of Public Instruction have under past and present statutes, the authority to compel boards of education and local school board officers to comply with the laws relating to schools and to secure observance of these laws through due process of law instituted in the courts under the direction of the Attorney General. [27]

The statutes of Michigan obligated the Superintendent of Public Instruction to do all things necessary in order to promote the welfare of public schools and public educational institutions. [28]

The relevant statutes provide that no separate school or department shall be kept for any person or persons on account of race or color and ultimately the Superintendent of Public Instruction has the power under M.S.A. 15.3253, M.C.L.A. § 340.253, to remove from office upon proper notice and proof any member of a school board who persistently and without sufficient cause refuses and neglects to discharge any of the duties of his office. [29]

The State Board of Education and the Superintendent of Public Instruction have ample administrative and judicial

---

26. Id. at 12.

27. M.S.A. Sec. 15.3252, M.C.L.A. § 340.252.

28. M.S.A. Sec. 15.3355, M.C.L.A. § 340.355.

29. M.S.A. Sec. 15.3355; Johnson v. Gibson, 240 Mich. 515, 215 N.W. 333 (1927).

process to compel compliance with the mandates of the Fourteenth Amendment and the Constitution of the State of Michigan to secure equal protection of law and equal educational opportunity for Black children, or for any children, who may be denied such educational opportunities by reason of their religion, race, creed, color or national origin.

In 1964, the Superintendent of Public Instruction published "Suggested Guidelines for Providing for the Maximal Education of Children of All Races and Creeds in the Schools of Michigan." These guidelines, prepared under the auspices of a Special State Committee on Equal Educational Opportunity, were specifically designed for use by local school boards in Michigan. The Preamble declared:

"Educators, citizens, and courts assert that prevention of personal associations through segregation—whether 'de jure' or 'de facto'—seriously affects the quality of education. Segregation, particularly involuntary segregation, whether it is social, ethnic, economic, or racial, diminishes equality of educational opportunity for all children."

Local school authorities were informed that:

"They should initiate reports and/or studies which clearly delineate the presence or absence of circumstances within a community that contribute to the development and/or maintenance of racially segregated schools and/or discriminatory practices."

\* \* \* \* \* \*

"The need for relief from overcrowded conditions in a school provides an opportunity for integration. Measures taken should be carried out in a manner that promotes integration in the receiving school"

\* \* \* \* \* \*

"When redistricting or relocation of schools is necessary and when new school sites are being selected, these efforts should be guided by principles which promote integration."

These guidelines also included a description of one proposed technique for regrouping students:

"Two or more adjacent schools are combined in a single attendance area. Rather than have all grades in each school the first three grades for a larger area may be assigned to a building and the next three grades for the larger area assigned to another building."

Seven years later, the Kalamazoo Board of Education adopted this technique to achieve integration in its schools.

Following the circulation of the Superintendent's guidelines, the State Board of Education and the Michigan Civil Rights Commission issued a widely publicized Joint Policy Statement on Equality of Educational Opportunity on April 23, 1966. That statement has been reproduced in its entirety in this court's previous opinion, and therefore need not be repeated here.[30] This document was exceedingly significant, however, for, referring to Brown I and to the public policy of the State, it contained the express recognition (1) that racially separate educational facilities are inherently unequal, and (2) that affirmative steps should be taken by local school officials to minimize racial isolation as much as possible. With respect to the latter proposition, the Joint Statement specifically provided:

"While recognizing that racial imbalance in Michigan schools is closely related to residential segregation patterns, the Board of Education and Civil Rights Commission propose that creative efforts by individual school districts are essential and can do much to reduce or eliminate segregation. Local school boards must consider the factor of racial balance along with other educational considerations in making decisions about selection of new school sites, expansion of present facilities, reorganization of

30. 346 F.Supp. at 776–777.

school attendance districts, and the transfer of pupils from overcrowded facilities. Each of these situations presents an opportunity for integration."

In order to facilitate the implementation of these directives, the statement concluded by calling for the collection of racial census data in the schools in order to chart "a base line against which future progress can be measured."

The court finds that the Joint Policy Statement of 1966 was a step by the State Board of Education and the Civil Rights Commission towards the full implementation of the Fourteenth Amendment in Michigan public schools. This is obvious not only from the letter and spirit of the Statement, but also from the express references to Brown I and to the Michigan Constitution, which itself was an implementation of the Fourteenth Amendment.

The State Board of Education made other general statements and recommendations concerning the desirability of integrating the public schools of Michigan. On September 13, 1967, the Board approved five recommendations to be proposed to the local school boards to encourage them to act to achieve educational opportunity. Among other things, the schools were encouraged to "integrate staff at all levels" and to "redraw school district boundaries to effectuate a greater degree of integration." On the death of Martin Luther King in 1968, the State Board affirmed its "strong intention to press on every front within its jurisdiction the cause for which Martin Luther King lived and died," "eradicating the ugly stain of prejudice which has marked our land and the problems that prejudice creates. . . ."

For a time after the adoption of the Joint Policy Statement of 1966, the State Board of Education began to lay the foundation for strong affirmative action to eliminate segregated schools in Michigan. The Michigan Department of Education began to collect and to publish annually school racial-ethnic census data. In March 1967, an Office of Equal Educational Opportunity was established within the office of the State Superintendent of Public Instruction. This office was given responsibility for conducting and supervising departmental efforts to achieve equality of educational opportunity. During 1968–1969, the OEEO embarked on a program designed to assist Michigan school districts to desegregate their schools. Among other things, the OEEO identified target school districts which maintained segregated schools, and assisted local district officials, including those in Kalamazoo, in drawing up desegregation plans.

The court observes that Marvin Tableman, who headed the Office of Equal Educational Opportunity, worked affirmatively to carry out the mandates of the Fourteenth Amendment and the Constitution of the State of Michigan, which were integration for equal educational opportunities. His activities in assisting the Kalamazoo School Board were substantial and effective.

Aside from grand pronouncements, the collection of data, payment for IIT computer runs, and provision of technical assistance to a few districts, the State Board of Education, even though apparently given extensive constitutional power to supervise and lead public education, has done virtually nothing to bring about a desegregation of public schools in Kalamazoo or elsewhere. The record includes many references to occasions on which the staff of the Michigan OEEO formally explained the critical need for specific criteria against which to assess the performance of local school districts in addressing school segregation.

Specific recommendations were repeatedly tendered to the State Superintendent of Public Instruction and the State Board on ways to effectively implement the 1966 Joint Policy Statement and to secure meaningful compliance with the desegregation policy. The Board ignored OEEO's concrete proposals for an equal opportunity audit of local school board policies, for a specific

scheduling of state-wide desegregation and even for in-depth official discussions of the segregation problem in Michigan. Instead, the Board applied its supervisory authority and initiative toward directing local districts to adopt codes of conduct regarding student discipline.

It is thus not surprising that the OEEO reported to the federal government in 1971 that there has been "only slight progress in achieving the objectives set forth in the 1966 policy statement."

Recently, under the white heat of election returns, the State Board has abandoned its policy of studied inaction for a positive retreat from constitutional principles. When frustrations compelled Mr. Tableman to resign his position at OEEO, the seeds of retrogression had been effectively sown. The OEEO has been allowed to decline. The Joint Policy Statement appears to have been abandoned.

Although the Superintendent has continued to make statements indicative of support for school desegregation, the court has perceived no truly effective action to end segregation by the Department of Education.

In sum, the Superintendent had general supervisory authority over public education in Michigan between 1954, the date of the Brown decision, and the adoption of the new Constitution. The State Board of Education and the Superintendent as its chief executive officer have shared this constitutional power between 1963 and the present. During this entire period, the Superintendent and the Board were aware of racial segregation in Michigan public schools through complaints to this effect and then through their own statistical data. Still, the Superintendent and the State Board have persistently failed to act in a meaningful way to ameliorate the situation.

 These facts compel the conclusion that the State of Michigan, through the State defendants in this case, has in-tentionally sanctioned the segregation of schools by local boards, and has made a substantial contribution to the creation and maintenance of segregated public schools in Kalamazoo and elsewhere. While the court notes that the Michigan Attorney General issued an opinion in 1970 that the State Board did not have the jurisdiction to hear appeals and review decisions of boards of education on attendance zones, the court finds that too many genuine opportunities for action have existed since Brown in 1954 for the segregation evidenced by the census statistics to be fully excused by pleas of racial neutrality and merely adventitious segregation.

The State Board's persistent failure to implement the Joint Policy Statement of 1966 has been effective notice to local school districts throughout Michigan of a policy of non-supervision in the area of desegregation. These school boards were able to conclude that they could take actions for perpetuating Black schools without the interposition of the State Board and the State Superintendent. This non-action exacerbated the segregated conditions in many school systems in the State of Michigan, diminished the likelihood of voluntary desegregation, and permitted or perhaps encouraged the kind of counterproductive action exhibited in Kalamazoo on July 6, 1971.

Activity at the local level was first sparked, according to the testimony of Edward P. Thompson, former President of the Kalamazoo Board of Education, by high school racial disturbances in the fall of 1967. Demands for revised curricula, Black studies and more open cheerleader selection alerted board members to deeper problems of hopelessness, fears and injustice inflicted on minorities by segregated conditions.

On May 20, 1968, the Kalamazoo Board appointed the Administration Integration Committee and charged it to "develop a master plan" for the integration of all levels of education. Following extensive study, research and deliberation, this committee filed its report,

entitled "School Integration" on November 8, 1968. That report commenced with a citation of the following "basic assumption:"

> "Since the Kalamazoo Board of Education has firmly committed itself to the integration of the Kalamazoo Public Schools, it is the function of this committee to supply Board members with information that will assist them in making decisions regarding procedures for integrating all schools."

The report thereupon set forth an extensive discussion, revealing the depth of the committee's study, of the various sociological, psychological, educational and legal reasons which formed the "rationale for integration." Included within the legal reasons were references to the Michigan Constitution and the 1966 Joint Policy Statement of the State Board of Education and the Civil Rights Commission.

The Administration Committee report summarized the statistical and other factual data revealing the complexion of the segregation problem in Kalamazoo and then proceeded to review the basic conceptual elements of each of nine possible solutions. Described for the board and public were the following desegregation alternatives: open enrollment, pairing, central schools (sometimes called "grade centers"), school closing, magnet schools and supplementary centers, education complexes, metropolitan school districts, pupil exchanges and an education park. No single such plan was specifically recommended.

Unfortunately, the Administration Committee's report was seriously misleading in at least one significant respect. The report defined "de facto" and "de jure" segregation as follows:

> "1. *De Facto Segregation*—is not instituted nor perpetuated by legal means, but exists as a matter of fact *whether with or without the wish of anyone concerned.*
>
> "2. *De Jure Segregation*—is segregation which is achieved by legisla-

tive means. It is now illegal." (Emphasis supplied.)

In legal terms, these definitions are clearly erroneous. "De jure" segregation is not confined to legislatively imposed segregation, but occurs when any state agency, including a local school board, intentionally segregates Black children. The clear implication of the report is that the Kalamazoo board could not possibly be guilty of de jure segregation, since the term applies only to legislatures. This is simply incorrect.

In one of the first cases in which the Supreme Court interpreted the Fourteenth Amendment, it clearly said that the Amendment applies to *all* officers of the State:

> "We have said the prohibitions of the Fourteenth Amendment are addressed to the States. * * * They have reference to actions of the political body denominated a State, by whatever instruments or in whatever modes that action may be taken. A State acts by its legislative, its executive, or its judicial authorities. It can act in no other way. The constitutional provision, therefore, must mean that no agency of the State, or of the officers or agents by whom its powers are exerted, shall deny to any person within its jurisdiction the equal protection of the laws. Whoever, by virtue of public position under a State government, deprives another of property, life, or liberty, without due process of law, or denies or takes away the equal protection of the laws, violates the constitutional inhibition; and as he acts in the name and for the State, and is clothed with the State's power, his act is that of the State. This must be so, or the constitutional prohibition has no meaning. Then the State has clothed one of its agents with power to annul or to evade it." Ex parte Virginia, supra, 100 U.S. at 346–347, 25 L.Ed. 676.

The definition of "de facto" segregation in the Kalamazoo Adminis-

tration Committee's report presents similar difficulties. Since under the Swann, supra, and Keyes, supra, theory, the question of *intention* is the essence of the difference between de facto and de jure segregation in law, it is simply not true that de facto segregation is segregation which "exists as a matter of fact whether with or without the wish of anyone concerned." On the contrary, segregation which exists by the wish and act of the local school board is without a doubt *de jure*, not de facto, segregation.

 To the extent that the Kalamazoo administration, school board, and public relied upon these definitions in analyzing the problem of segregated schools in the district, they made a very serious error. And this court has concluded on the basis of a full review of the evidence, Kalamazoo's public schools were segregated on a *de jure* basis.

On November 6, 1968, the President of the Kalamazoo Board of Education appointed a Citizens' Committee on Integration to recommend, among other things, general guidelines for the achievement of socio-economic and racial integration throughout the Kalamazoo public schools. The report was submitted on August 18, 1969.

The major thrust of the report was a detailed proposal for change. Explicitly structured recommendations were presented rather than mere analytical descriptions. The report also stressed the legal and moral obligations and the social and educational reasons to integrate the public schools of Kalamazoo as soon as possible.

Although the Citizens Committee independently investigated several alternative desegregation schemes, including open enrollment, grade centers, educational service centers and an Evanston-style unitary facility, it endorsed the pairing concept mentioned in the 1964 State Superintendent's Guidelines. The concept involved basic retention of geographically contiguous "neighborhood" attendance zones. The zones would be enlarged and stretched so as to bridge inner city minority students with suburban White students. Such a plan seemed most conducive to circumstances in Kalamazoo, since the district is relatively compact. Schools within these enlarged districts would, under this plan, service three rather than six elementary grades, with kindergarten children attending all schools.

The Committee urged that before full implementation of this integration plan, scheduled for September 1971, a comprehensive program of minority staff recruitment, in-service staff training, curricula revision, and community communications be undertaken for two years. This program, dubbed "Phase One" and "Phase Two," was in fact adopted by the board on September 15, 1969, and later effectuated. With respect to proposed "Phase Three," actual desegregation, the board authorized a more detailed feasibility study to be made by the administration during the school year of 1969–1970. At this time the board was aware of the availability of computer assistance at the Illinois Institute of Technology which could facilitate the generation of these necessary details.

While the Citizens' Committee was doing its study on integration, the Michigan Civil Rights Commission focused additional state governmental attention on the racial characteristics of Kalamazoo public schools. In April 1969, the Commission held hearings and in October of the same year it issued its report and recommendations regarding the "Status of Race Relations in the City of Kalamazoo." This report also emphasized statistical information showing the disproportionate concentration of the races in the schools and the resultant educational deprivation. Its number one recommendation to the school board was to *"Agree quickly on a plan for desegregation of all schools and immediately carry it out."* (Emphasis supplied.)

Meanwhile, in response to the local board's request for specifics, the Kalamazoo school administration initiated contacts with the Illinois Institute of

Technology (IIT) computer service suggested by the Citizens Committee. On December 19, 1969, IIT made a specific contract proposal to Kalamazoo officials. The financial demands of the proposal forced these local officials to investigate possible sources of necessary funding. The State Department of Education was contacted and, following substantial communication, agreed to underwrite the project. On April 10, 1970, the contract with IIT was executed.

The Kalamazoo administration, particularly the Department of Child Accounting and its Director, Mr. Maynard Morgan, immediately began the major task of gathering and organizing data concerning pupil identity, race, location and grade for the entire Kalamazoo school district. This data was then submitted to IIT along with maps and statistical guidelines in August 1970. The guidelines included a request for a feasible plan for implementing the basic pairing concept recommended by the Citizens Committee, with student populations fixed roughly between 10% and 25% Black.[31] In the fall of 1970, according to the testimony of Mr. Morgan, a few administrative "bugs" were ironed out of the data and computer programming task was completed.

On January 4, 1971, the Kalamazoo Board of Education further addressed planning the integration of its schools. Following public discussion, the board voted to adjust the boundaries of its two high schools, Central and Loy Norrix, so as to accomplish their desegregation in the coming school year, to begin in September 1971. The board further resolved to desegregate the five junior high schools by September of 1972. Plans and maps for each of these proposals were reviewed and adopted.

In March 1971, school administrators met with IIT officials to discuss the status of the computer system. It was revealed at this time that IIT was finished with all necessary preparations and that the computer was available on very short notice to generate the concrete results desired by the board.

After briefly checking with Kalamazoo Superintendent John Cochran as to the possibility of obtaining a prompt administrative response, the Board of Education resolved on April 5, 1971, on the motion of Edward Thompson:

"That all schools in the Kalamazoo system be desegregated promptly, that the school administration present to the board at its May 3 meeting a plan for desegregating all the schools, and that it then advise the board of the earliest date for accomplishing the same."

Four members of the board supported this resolution, while the remaining three, although present, abstained. Although defendants have insisted that this resolution was a bolt out of the blue, careful reflection upon the steady chronology of events, as set forth above, reveals beyond reasonable question that it was neither precipitate nor surprising.

Far from demanding from the administration in one month plans which should have received greater consideration, the April 5 resolution merely sought the final report of specifics which had been the object of over eighteen months' combined effort of the Kalamazoo administration, the Michigan Department of Education and the IIT computer technicians. These specifics, in turn, had only been sought after fifteen months of investigation, research and study spearheaded by two specially appointed, independent committees. Board members Thompson, Luff, Schmae and Thomas, who supported the April 5 and May 7 resolutions, were advised of and involved in this long chain of events. Their confidence that an appropriate response could be forthcoming from the administration within the time allotted was rewarded by the actual subsequent sequence of events.

Two days after the board's April 5 action, the school administration received

31. In 1969, 17.6% of the students in Kalamazoo public schools were Black.

from IIT a full print-out of possible boundary adjustments and pupil assignments conforming to earlier requests. Again under the principal direction of Child Account Officer Maynard. Morgan, the administration reduced the assembled data to map form to facilitate explanation and understanding. During this process, the data was also scrutinized for practical irregularities, and modifications and refinements in boundary locations were effected. By the last week in April 1971, administration officials were in a position to publicly present and explain the contemplated elementary school rezoning. The plan was widely publicized in the local news media.

The regularly scheduled May 3, 1971 school board meeting, although specially located in a high school auditorium in anticipation of a large audience, was adjourned shortly after it convened because of extreme overcrowding. Public debate continued, however, both on May 3 and at a public hearing on May 6 in Miller Auditorium on the campus of Western Michigan University, attended by literally thousands of citizens. The formal board meeting originally planned for May 3 was held on May 7 before several hundred people in the auditorium of Kalamazoo Central High School.

At the public hearing of May 6, many speakers expressed their feelings about the plan. The board listened extensively to various viewpoints, although at this state, Edward Thompson later testified:

> "We had had so many hearings on so many different things and heard so many people over so many years that, frankly, I wasn't interested in listening to any more hearings on this kind of thing. I felt the kind of input we were getting was repetitive and I was ready to make up my mind."

At the conclusion of this meeting, the Kalamazoo Board of Education decided by a vote of four to three to implement the proposed desegregation plan for the elementary schools in September of 1971 and to advance the junior high plan to this date as well. Despite defendants'

repeated assertion that the decision of May 7 was predicated on no more than a month's deliberation, this court, after hearing and reviewing the voluminous testimony, has concluded that this board action on May 7 was carefully conceived and thoughtfully adopted. This conclusion is no less compelling due to the natural fact that much of the mechanical legwork was accomplished by upper echelon members of the full-time administrative staff rather than performed entirely by the members of the school board.

The board members kept themselves advised of developments and provided the basic conceptual guidelines. They also sought and received assurances from their competent and trusted staff that the proposed plan was feasible, that buses could be obtained, facilities prepared, teachers reassigned, and so forth. All of the studies, planning and discussion initiated and supervised by the board preparatory to the May 7 action emphatically confirm the integrity of the Kalamazoo Board of Education's later declaration in "state court" explicitly denying that the "May 7 plan" was unreasonable, arbitrary and capricious.

█ The entire chain of events detailed above establishes that by the year 1971 government officials with direct responsibility for public education on both the state and local level—including principally, the defendants named herein —had become thoroughly, visibly, vocally and inextricably involved in policymaking to eliminate segregated conditions in the Kalamazoo public schools. Policy statements and guidelines were issued, public hearings conducted, racial censuses administered and distributed, promises made. All of these occurrences were intended to and did accomplish an elevation of public consciousness and an uplifting of the expectations of citizens of all races. In the face of such activity, any assertion by defendants that the state action element of plaintiffs' Fourteenth Amendment complaint is not satisfied in this case must be discarded as wholly untenable.

Even beyond the plain fact that defendants directly and exclusively control the student and teacher assignment policies challenged by plaintiffs, the facts summarized above, as elicited at trial, demonstrate beyond contradiction specific state responsibility for the established inequitable consequences clearly and foreseeably flowing from racial segregation in the Kalamazoo public schools.

The May 7 plan of desegregation, thoroughly conceived and conscientiously prepared, was the ultimate manifestation of the conspicuous involvement of state authority in the matter of racial distribution of students. It was this crucial fact of involvement, even more than the actual specific plan adopted on May 7, 1971, from which defendants could not and cannot constitutionally retreat. Especially following these activities of the past decade and a half, defendants cannot simply abdicate all responsibility and disclaim all consequences of student assignment practices which have the clearly foreseeable, and thus, intended effect of segregating the races.

Moreover, because the court has concluded that the Kalamazoo Board of Education intentionally created and maintained segregated schools at least during the period from the early 1950's until the adoption of the May 7 plan, the court finds that the Kalamazoo Board of Education was constitutionally required to adopt the May 7, 1971 plan, or a substantially similar program.

The court further concludes that the adoption of the May 7 plan by the Kalamazoo Board of Education was intended to be and was in fact an implementation of the Fourteenth Amendment of the United States Constitution, the mandatory antidiscrimination clauses of the Michigan Constitution of 1963, Art. I, Sec. 2, and Art. VIII, Sec. 2, which were themselves implementations of the Four-teenth Amendment, and the 1966 Joint Policy Statement of the Michigan Civil Rights Commission and the State Board of Education. Apart from the question of whether the Kalamazoo board was constitutionally required to adopt the May 7 plan or something substantially the same, the court finds that the board's actions were "proceedings to protect the rights guaranteed to members of all races under the Fourteenth Amendment." Bradley, supra, 433 F.2d at 902. The terms of the public debate, of the Administrative and Citizens' Committees reports, and of the board's deliberations confirm this conclusion.

Insofar as desegregation was constitutionally required, the court finds that the Kalamazoo board was fulfilling its constitutional mandate to act with "all deliberate speed" to put an end to segregated schools in the district when it adopted the May 7, 1971 plan. Brown v. Board of Education, 349 U.S. 294, 301, 75 S.Ct. 753, 99 L.Ed. 1083 (1955).[32]

Even as it passed the "May 7 plan," the board articulated the policy that this plan would be subject to further administrative modification to minimize inconvenience and simplify administrative problems. In fact, Mr. Maynard Morgan testified that during the course of five public hearings conducted at each of the district's junior high schools following the May 7 action, refinements were suggested and made pursuant to this delegated authority. All modifications were designed to decrease distances between home and school and to maximize the geographic contiguity of the new attendance zones.

The May 7 plan did not survive the extreme reaction of the citizens of Kalamazoo. On July 6, 1971, after the spring elections, the new board adopted a resolution which became known as the July 6th Resolution. The three dissenters to the May 7 action were joined by

32. "For an American who is devoted to his country and wants to believe in the intelligence and good-will of its citizens it is very painful to contemplate and difficult to understand continued resistance to school de-segregation." Julius J. Hoffman, United States District Judge for the Northern District of Illinois, in United States v. School District 151, 301 F.Supp. 201, 205 (N.D.Ill. 1969).

the two new members to form a five to two majority in favor of this resolution. Board President Tyler, one of those supporting the resolution, explicitly indicated that he disapproved the language of the resolution calling for further study of alternative desegregation plans, because he was against any such board-instituted plan.

The court finds that although it was phrased as a mere "postponement," the July 6 action was intended to be and did serve as an outright revocation of not only the specific May 7 plan but also the broader underlying policy of school desegregation at the elementary and junior high levels in Kalamazoo. It operated to fully rescind all previous board commitments to integration of public education and to freshly, sweepingly and expressly relegate students to circumstances of racial isolation which denied equal educational opportunity and, consequently, denied these students the equal protection of state law.

That the July 6 resolution was, in fact, a firm nullification and not merely a postponement of board activity in this area is conclusively established by the subsequent course of events as well as by the statements of board members themselves. Although the board did, in early 1972, appoint a committee known as the "Gardner Committee" to study the grade center concept as a possible alternative desegregation plan, the plain fact is that during the two years which have elapsed since July 6, 1971, the board has never adopted or responded favorably in any way to any alternative to the May 7 plan. Pursuant to the authority conferred explicitly by the Sixth Circuit Court of Appeals, 448 F.2d 635, this court has repeatedly urged the parties to come forward immediately with any proposals for change or modification in the school attendance plan implemented on May 7 and subsequently ordered by this court. Notwithstanding such encouragement, the court has never been approached in this regard.

The testimony and other statements of members of the Kalamazoo board further indicate the hostility of the board to desegregation in any form. While everyone who testified conceded that effective desegregation in Kalamazoo would require boundary adjustments and some publicly sponsored transportation, several board members clearly stated that they opposed any school attendance plan which involved such transportation. Mr. Norman H. Bruex, a board member in July of 1971, but no longer with the board, testified that he has consistently felt opposed to "forced busing" in any form and that he never would have supported abandonment of the "neighborhood school" policy. He testified that he never intended to vote for *any* plan which included busing of children, and that he did not intend his vote for the July 6 resolution to be such a vote. He interprets busing to achieve integration as being "forced busing," but busing children for other purposes to be "necessary busing."

Likewise Mr. Jack H. Hoekstra, the author of the July 6 resolution and a member of the board since July 1, 1971, testified that he has never placed any importance on racial mixture of students, that he was and is categorically opposed to busing students for desegregation purposes and that he recognizes no deprivation of equal opportunity as a result of racial segregation. Mr. Hoekstra's testimony as to his interpretation of the July 6 plan follows:

"Q. So postponement, in terms of your offering it [the July 6 resolution], did not mean any possibility of returning to May 7th, isn't that so?

"A. That is true."

He said the word "postponement" appearing in the July 6 resolution meant that no plan for the busing of a child from his neighborhood would ever be adopted.

Robert W. Keller, a current board member elected in June of 1972, also testified to an unequivocal opposition to any plan of school desegregation. He even expressed hostility to a voluntary

open enrollment arrangement although he indicated that he would accede to it if other board members saw a need for such a plan.

Dr. Dale Pattison, elected to the board along with Mr. Hoekstra in June of 1971, expressed similar anti-busing sentiments when he testified at the preliminary injunction hearing in August 1971. He wanted to preserve neighborhood schools, but would "permit" "voluntary" integration. He opposed the adopted integration plan on basis that it would increase measles and chickenpox, was too costly, had falsely labeled the community as "racist," was "hasty," etc. He testified further that "those who . . . invested thousands of dollars in a home have more right to a school right around the block . . . from that home than those who go into large apartment complexes."

Finally, Board President Alan Tyler, as previously noted, commented at the very time of the July 6 resolution that he saw no purpose to a mere "postponement" because he was categorically opposed to alteration of the neighborhood school zones as then drawn. Nothing in his subsequent behavior or testimony contradicts this philosophy.

The court also notes the position and understanding of the major organized opposition to the May 7 plan, which was also the major organized support for those board members who voted for and who subsequently supported the July 6 resolution. The National Association for the Advancement of Neighborhood Schools was formed in 1971 by a nucleus of campaign workers who had actively supported Mr. Jack Hoekstra and Dr. Dale Pattison, and who later supported Mr. Robert Keller and Mrs. Barbara Marr. All of these candidates for election ran on a strong anti-busing platform.

On March 5, 1973, the Association officially wrote to the Kalamazoo Board of Education on the subject of a possible settlement of the case presently before the court. After reminding the board members that Mr. Hoekstra, Dr. Pattison, Mr. Keller, and Mrs. Marr had been elected with its help and support, the Association demanded that the Kalamazoo board enter into no compromise settlement. In addition, the letter noted that "in July, 1971, . . . the new board *rescinded* the earlier board's decision to bus."

The Association thus indicated its belief that the July 6 resolution was a rescission, and applied its considerable and perhaps decisive political influence with the board majority to assure that nothing would be done to save integration in Kalamazoo.

It is therefore abundantly clear that at the time of the July 6 resolution and at all times since, the Kalamazoo Board of Education has been unamenable to any effective measures to significantly reduce the degree of racial segregation present in the schools before May 7, 1971. The board's position, therefore, was and is resolutely supportive of a complete retreat from state governmental initiatives which culminated in formal desegregation of the Kalamazoo public schools.

In light of these facts, this court earnestly reiterates its previous ruling that the July 6, 1971 resolution of the Kalamazoo Board of Education was an act of rescission repugnant to the Fourteenth Amendment to the Constitution. The court would again note the similar findings and conclusions recorded in Keyes, supra, 303 F.Supp. 289; 313 F.Supp. 61, aff'd, supra, 445 F.2d 990, cert. denied as to this portion, 413 U.S. at 195, 93 S. Ct. at 2691, and in Bradley, supra, 433 F. 2d 897.

In Keyes, the facts were almost identical to those presently before this court. The defendant school board adopted a plan of desegregation, a school board election was held, and, before the desegregation plan could be implemented, the new board nullified that plan. The court found, at the time of granting a preliminary injunction, that the rescissionary resolution "was a legislative act

which had for its purpose restoration of the old status quo and was designed to perpetuate segregation in the affected area." Supra, 303 F.Supp. at 295. The court accordingly found this to be an act of "de jure" segregation. Following a trial on the merits, the court further rejected the notion that no rights had vested under the desegregation plan due to the fact that it was nullified before actual implementation.

"True, the (desegregation) resolutions had not been carried out, but extensive preparations were in progress. In any event, this cannot be made to turn on any property right analogy. Plaintiffs were deprived of a right to seek and possibly attain equality." Supra, 313 F.Supp. at 67.

This is precisely the situation in the instant case.

 Likewise, the Sixth Circuit Court of Appeals has affirmed the principle that legislative actions which retard desegregation progress are unconstitutional. Bradley, supra. Put very succinctly:

"State action cannot be interposed to delay, obstruct or *nullify* steps lawfully taken for the purpose of protecting rights guaranteed by the Fourteenth Amendment." Supra, 433 F.2d at 903. (Emphasis supplied.)

 Therefore, even if the July 6 resolution is taken to be a mere postponement, and not a full rescission, it is still unconstitutional under the terms of the Bradley decision, supra.

At trial, defendants have attempted to distinguish Bradley on the grounds that that decision merely held unconstitutional the effort of one legislative body, the state legislature, to tie the hands of another legislative body, the Detroit Board of Education. This reading of Bradley, of course, fails to distinguish the factually more parallel Keyes decision, and, further, is untenable. The basis of the ruling in Bradley was a finding of a violation of the equal protection clause of the Fourteenth Amendment, not some kind of infringement of local school board sovereignty. The plaintiffs awarded relief in Bradley were school children and their parents, not the local school board.

This court therefore finds at this time that the July 6, 1971 resolution of the Kalamazoo Board of Education had a purpose and effect so profound that it alone would necessitate a judgment for plaintiffs in this cause.[33] In accordance with the findings set forth at length earlier in this opinion, however, the court finds that this unconstitutional act also compounded defendants' many other constitutionally impermissible actions in contributing to the inequity inherently incident to racially segregated education in Kalamazoo.

The court further concludes that the July 6 rescission of the May 7 desegregation plan was itself an act of de jure segregation committed by the Kalamazoo Board of Education, with the knowledge but without the opposition of the State Board of Education. The foreseeable, necessary, and direct effect of the July 6

33. The effect of the July 6 action and the surrounding circumstances of hostility to desegregation extended beyond the assignment of students to particular schools. Three days after the resolution, July 9, the new Board sought and obtained the resignation of Superintendent of Schools John Cochran. See this court's earlier opinion at 346 F. Supp. 774. The cumulative effect of these new board policies and attitudes resulted in the departure from the Kalamazoo system of several experienced and able administrators. Dr. Reed Hagen, Assistant Superintendent under Dr. Cochran and acting Superintendent for a year after Dr. Cochran's departure, left in June of 1972. At the same time, William B. Cansfield, Director of Student Personnel, and Dr. Charles Warfield, Director of Human Relations, left the system with public expressions of dissatisfaction with the new board's attitude toward those favoring desegregation. This is precisely the kind of "chilling effect" which this court anticipated in its earlier opinion and which surely further detracted from the quality of services which the Kalamazoo Board of Education was able to subsequently provide.

action was to recreate a dual system by resegregating the schools. Bradley, supra, 484 F.2d 215, at 254. This action literally transformed an integrated system (albeit a very new one) into a racially segregated system in direct contravention of the United States Constitution and the ruling of the Supreme Court in Brown I, supra.

The inclusion of the voluntary open enrollment provision in the July 6 resolution will not remove the rescission's constitutional infirmities. The United States Commission on Civil Rights has reported, "One of the primary reasons school districts undergoing desegregation favor freedom-of-choice plans is that they do not work." [34] The Supreme Court has noticed that the "general experience under 'freedom of choice' to date has been such as to indicate its ineffectiveness as a tool of desegregation," and has held, "if there are reasonably available other ways, such for illustration as zoning, promising speedier and more effective conversion to a unitary, nonracial school system, 'freedom of choice' must be held unacceptable." Green v. County School Board, 391 U.S. 430, 440–441, 88 S.Ct. 1689, 1695–1696, 20 L.Ed.2d 716 (1968). See also Raney v. Board of Education, 391 U.S. 443, 88 S.Ct. 1697, 20 L.Ed.2d 727 (1968); Monroe v. Board of Commissioners, 391 U.S. 450, 88 S.Ct. 1700, 20 L.Ed.2d 733 (1968); Swann, supra, 402 U.S. at 7, 91 S.Ct. 1267, 28 L.Ed.2d 554.

Considering the circumstances surrounding the adoption of the July 6 voluntary open enrollment provision, the court concludes that it was not intended to operate as an effective desegregation device. The voluntary open enrollment plan was intended to be an empty gesture toward compliance with the requirements of the Constitution, while the reality was that the May 7 desegregation plan was being effectively rescinded and nullified.

This court also finds that on and after July 6 the May 7 plan was, to say the least, a "reasonably available" way to achieve a "speedier and more effective conversion to a unitary, nonracial school system" as required by the Constitution than the voluntary open enrollment plan. Green, supra, 391 U.S. at 441, 88 S.Ct. at 1696.

### V.

The May 7 desegregation plan necessarily involved some transportation of students to fulfill its goals of providing equal educational opportunity for all children. In Kalamazoo, as in other cities which have taken affirmative action to end unconstitutional segregation, the factor of transportation of students has often been exaggerated and distorted by the opponents of integration.

To keep the matter in its proper factual perspective, it is appropriate to review the historical and contemporary role of student transportation in our country's educational system.

Chief Justice Burger in his opinion for the Court in Swann, supra, declared:

"Bus transportation has been an integral part of the public education system for years, and was perhaps the single most important factor in the transition from the one-room schoolhouse to the consolidated school. . . .

"The importance of bus transportation as a normal and accepted tool for educational policy is readily discernible . . . ." 402 U.S. at 29, 91 S.Ct. at 1282.

In his partial concurrence in Keyes, supra, Justice Powell observed, "The transporting of school children is as old as public education, and in rural and some suburban settings it is as indispensable as the providing of books." 413 U.S. at 243, 93 S.Ct. at 2714.

Furthermore, as the Fifth Circuit observed, "Private schools do not disdain bussing." United States v. Texas Education Agency, supra, 467 F.2d at 874. States may provide transportation for pa-

34. "Federal Enforcement of School Desegregation" 15 (Sept. 11, 1969).

rochial school students if it does so for public school students. Everson v. Board of Education, 330 U.S. 1, 67 S.Ct. 504, 91 L.Ed. 711 (1947).

All authorities agree that the proportion of public school children who are transported is substantial. Chief Justice Burger put the figure at approximately 39%, or eighteen million, in 1969–70. Swann, supra, 402 U.S. at 29, 91 S.Ct. 1267. Mr. Justice Powell estimated that "half of all American children ride buses to school *for reasons unrelated to integration.*" Keyes, supra, 413 U.S. at 243, 93 S.Ct. at 2714. (Emphasis supplied.) And, Justice Powell noted, Senator Abraham Ribicoff of Connecticut has put the figure at two-thirds. Id. at n. 22.

The important thing is that, nationally, nearly all transportation of students has nothing to do with desegregation. It has been estimated that only three per cent of all school transportation is for purposes of integration.

Kalamazoo has not been out of step with the rest of the nation. As noted previously, in September 1967 the Kalamazoo board, *responding to a clear public demand,* established a system of transportation of all students who lived over a mile and a half from school. During 1970–71, the board transported at public expense, 11.7% of all the public elementary school children and 39% of all the public junior high school children for reasons other than safety or integration.

The transportation of students to schools some distance away is not entirely without some burden to students and parents. When a child lives some distance from and must be transported to school, his ability to participate in extra-curricular activities is diminished. Similarly, it may be more difficult in some instances for parents to participate in school-related activities. However, the distances involved in Kalamazoo are never great, and these circumstances have never been regarded as presenting serious difficulties.

Those who oppose transportation of students for purposes of integration cite these reasons. However, it is inconsistent for people to demand, or at least accept, the massive transportation of students for all sorts of reasons except integration. Transportation for purposes other than integration has all the inconveniences and disadvantages of transportation for purposes of integration. Since all transportation of students is on a par in this respect the objections to transportation for purposes of integration must be racially related.

Of course, all else being equal, the concept of maintaining schools within walking distance seems convenient to those affected and therefore attractive. However, all things are not equal in a district which has a history of de jure segregation, Swann, supra, 402 U.S. at 28, 91 S.Ct. 1267, or in a district which has raised expectations of equal education by proceedings to protect rights guaranteed by the Fourteenth Amendment, Bradley, supra, 433 F.2d at 902.

When the inequities imposed by racially segregated schools are in the balance, the convenience of schools within walking distance cannot be accorded overriding weight. Especially in a district as compact as Kalamazoo, which testimony indicates may be traversed from corner to corner in about a half hour, some practical adjustments must be made to remedy the greater need, one of constitutional dimensions.

The May 7 plan does require some transportation beyond that previously provided by the Kalamazoo Public Schools in order to alleviate the segregated conditions existing when the plan was adopted. However, the plan itself is really very modest, and the extent of additional transportation must not be exaggerated. According to the defendant Kalamazoo Board of Education, only about 3,717 additional students have been transported as a result of the implementation of the May 7 plan. Since the Kalamazoo schools transported a total of 10,918 students during the 1972–

73 school year, the proportion transported because of the integration plan is only a little over one-third.

 Even though the May 7 plan was somewhat modest, the court notes that it was *voluntarily* adopted by responsible Kalamazoo school authorities in a bona fide effort to bring substantial equality of opportunity to all children in Kalamazoo as mandated by the Constitution. Where local authorities responsibly perform their duties under the Constitution, and do not act to deprive individuals of their constitutional rights, in the absence of persuasive countervailing evidence, this court ought not and did not change the plan. Under these circumstances, the court approves the May 7, 1971 plan.

The United States Commission on Civil Rights is a legally constituted Presidential Citizens study agency ordained by Executive Order to consider race relations and make recommendations. Its "Your Child and Busing" Report is in evidence. Its concluding remarks are a clear and direct statement of the present situation and the alternative courses facing our country. It is worthy of judicial notice and deliberate consideration.

"For 50 years, the school bus has been a friendly figure—an accepted and vital part of the American educatiqnal picture. Without the bus, millions of Americans would have had to rely on the limited educational offerings of one-room schools. Some might never have completed school.

"Now, because it is being used to carry out desegregation plans, some suddenly have cast the familiar yellow bus as a villain. It is a reversal of roles that cannot but trouble thoughtful Americans.

"*The basic issue is not busing but integration.* Either we continue moving toward the goal of integration, or we reject it and hold onto the separate schooling outlawed in the *Brown* decision. For in rejecting busing in the racially segregated situation in which most Americans live today, we also reject integration.

"Instead of resisting busing, the Nation should seek to follow the example of some 30 seventh graders at Jefferson Junior High School in Pontiac, Michigan. After buses were burned, schools were picketed, and children were called insulting names, the seventh graders decided to come to the defense of busing and integration in that city. They formed a biracial organization, called 'The Group,' which travels from school to school, putting on skits and conducting other activities in behalf of racial harmony in Pontiac. Their slogan:

'We Can Make It Work.'

"It is a motto worthy of parents, educators, all branches of government, and the Nation as a whole."

## VI.

Plaintiffs have asked the court to grant attorney fees in this case. In light of the Supreme Court's recent action in Northcross v. Memphis Board of Education, 412 U.S. 427, 93 S.Ct. 2201, 37 L.Ed.2d 48 (1973), the court will reserve decision on this issue. In Northcross, a school desegregation case, the Supreme Court remanded to the Sixth Circuit for specific findings on the issue of the propriety of a denial of attorney fees in the case.

The entire content of this opinion embodies the findings of fact and conclusions of law in lieu of those required by Fed.R.Civ.P. 52.

### SUMMARY CONCLUSIONS

The following is not all-inclusive, but simply a brief summary of the court's conclusions. This summary is not intended to limit, replace or modify its previously stated findings.

The Kalamazoo Public Schools historically, and especially in recent times, have been racially segregated at all levels of the school system and at a significant number of schools. Segregation

here means disproportionate racial concentration.

As a matter of fact and law, this condition of segregation resulted in unequal educational opportunities for Black and White students. Brown I, supra.

In the period before May 7, 1971, the Kalamazoo Board of Education did not resolutely and consistently follow a "neighborhood school policy." A glance at the attendance boundary map reveals that elementary schools were not situated and boundaries were not drawn in a fashion which regularly placed students in the schools closest to their homes. The standard size of 13 grade and kindergarten classrooms was often departed from. Both junior and senior high attendance zones were too large to represent "neighborhoods" within the commonly understood meaning of that term. A substantial number of elementary, junior high, and senior high school students lived more than 1½ miles from school and were transported at district expense beginning in 1966–67.

 From at least the middle 1950's until the early 1970's the Kalamazoo Board of Education followed a purposeful pattern of racial discrimination by intentionally creating and maintaining segregated schools in Kalamazoo. The Kalamazoo Board thus denied Black children equal educational opportunities and thus denied them equal protection of the laws within the Fourteenth Amendment of the United States Constitution.

Among other things, the Kalamazoo board deliberately rigidified the attendance boundaries of schools attended by the majority of Black students in order to contain the Black students in these schools and to preserve other schools for Whites. The board established optional attendance zones in some transitional areas to allow White students to opt out of a school with a relatively high proportion of Black students and to go instead to a school with a lower proportion of Black students.

The board's site location and school construction policies likewise served to intentionally create and maintain segregated schools in Kalamazoo. In 1959, the board constructed Northglade Elementary and Indian Prairie Elementary schools within about two miles of each other with conscious knowledge that Northglade would be predominantly Black and Indian Prairie predominantly White.

In the late 1950's and early 1960's, the board went into an extraordinarily close association with a real estate developer in the development of Arcadia subdivision. The board not only purchased a school site in Arcadia before many houses were built there, but allowed the developer to put up a sign advertising the fact that a new school was to be built in the subdivision. As a result, many Whites were drawn to the area, and, predictably, Arcadia School was predominantly White.

Thus, the Kalamazoo board was not only acting to maintain the segregated character of Kalamazoo schools, but was intentionally acting in such a way as to promote and create a segregated residential pattern.

The Kalamazoo board's additions of permanent and portable classrooms likewise served to intentionally maintain segregated schools.

 The board's policies of assigning most Black teachers to disproportionately Black schools accentuated the racial identifiability of these schools, and was itself unconstitutional discrimination.

The board's responsibility and liability for segregated conditions exists apart from the actions of any other public or private institution or individuals.

Especially up to 1967, the Kalamazoo board's conscious neglect and failure to act when opportunities presented themselves contributed substantially to the growth and maintenance of segregated conditions in the schools. Since 1954, 68 school construction projects and 32 attendance boundary adjustments have been made in Kalamazoo. Despite the fact that virtually every such project or

alteration potentially afforded an opportunity to confront the inequities which inhere in a segregated situation, defendants concede that at no time before 1966 did the board formally and publicly consider any program, or make any decision, or implement any policy designed to positively confront the problem of racial isolation in the Kalamazoo public schools. In light of the clear notice and requirement given to all school boards by Brown I, this failure to act was itself a deliberate decision to forego its opportunity to correct the existing segregated conditions. By its intentional acts of commission and omission, the Kalamazoo Board of Education denied Black and White children equal protection of the laws.

In Kalamazoo, the actions of multiple state governmental bodies, many of them apparently in violation of the Constitution, joined with actions of a similar character by federal agencies and with the actions of private institutions to produce segregated conditions in Kalamazoo. The fact that many public and private institutions made deliberate and substantial contributions to neighborhood and school segregation in Kalamazoo does not excuse the State Board of Education, the Superintendent of Public Instruction, and the Kalamazoo Board of Education from liability for their violation of the Constitution of the United States and the Constitution of the State of Michigan. The State of Michigan cannot parcel out its jurisdiction and deliberately achieve by bits and pieces what it could not do directly by statute. When such a situation is alleged to exist, the court must look closely at the actions of each agency to determine whether it has met its constitutional responsibilities. To allow each agency to plead constitutional violations of other agencies in exculpation of its own, would be to mock the Constitution of the United States and the Constitution of the State of Michigan.

Under the Michigan Constitution of 1908, the Superintendent of Public Instruction was given general supervisory authority over public education in Michigan. Under the Constitution of 1963, the State Board of Education and the Superintendent, as its chief executive officer, have been given this authority. At least since the date of the Brown decision, 1954, the Superintendent and the Board have been aware of segregation in Michigan public schools. The Superintendent and State Board, although sometimes issuing promising statements, have persistently failed to act in a meaningful way to ameliorate the situation, except for the short period after adoption of the new State Constitution. This fact compels the conclusion that the State of Michigan, through the defendant State Board and the defendant Superintendent of Public Instruction, has intentionally sanctioned the segregation of schools by local boards, and has made substantial contribution to the creation and maintenance of segregated public schools in Kalamazoo and elsewhere.

The adoption of the May 7 plan by the Kalamazoo Board of Education was intended to be and was in fact an implementation of the Fourteenth Amendment of the United States Constitution, the mandatory antidiscrimination clauses of the Michigan Constitution of 1963, Art. I, Sec. 2, and Art. VIII, Sec. 2, which were themselves implementations of the Fourteenth Amendment, and the 1966 Joint Policy Statement of the Michigan Civil Rights Commission and the State Board of Education. Apart from the question of whether the Kalamazoo board was constitutionally required to adopt the May 7 plan or something substantially the same, the board's actions were "proceedings to protect the rights guaranteed to members of all races under the Fourteenth Amendment." Bradley, supra, 433 F.2d at 902.

Since the Kalamazoo School Board's discrimination against Black children existed before and at the time of the adoption of the May 7, 1971 action to desegregate its dual school system, the May 7 board was performing its consti-

tutional duty by the creation and implementation of the May 7 integration plan.

Because the Kalamazoo Board of Education, the State Board of Education, and the Superintendent of Public Instruction by their intentional acts and failures to act contributed substantially to the creation and maintenance of segregated schools in Kalamazoo, the May 7, 1971 desegregation plan, or a substantially similar program, was constitutionally required.

The May 7, 1971 plan was the result of several years of public discussion of the problem of segregated schools in Kalamazoo. It was immediately preceded by intensive exploration by the Board and extensive debate by the public. The May 7, 1971 plan was thus not adopted in undue haste, and was not arbitrary or capricious.

Insofar as desegregation was constitutionally required, the Kalamazoo board was fulfilling its constitutional mandate to act with "all deliberate speed" to put an end to segregation in its schools. Brown II, supra.

The Kalamazoo Board of Education's July 6, 1971 resolution was intended to be and was in fact a rescission of the May 7, 1971 desegregation plan.

Even if the July 6, 1971 resolution was not a full rescission, the resolution was action to impede, delay or frustrate proceedings to protect the rights guaranteed to members of all races under the Fourteenth Amendment, and was therefore constitutionally impermissive. Bradley, supra, 433 F.2d at 902.

The Kalamazoo Board of Education's July 6, 1971 resolution was itself an act of de jure segregation committed by the Kalamazoo Board of Education, with the knowledge but without the opposition of the State Board of Education. The foreseeable, necessary, and direct effect of the July 6 action was to recreate a dual system by resegregating the schools. This action literally transformed an integrated system (albeit it a very new one) into a racially segregated system in direct contravention of the United States Constitution and the ruling of the Supreme Court in Brown I, supra, Bradley, supra, 484 F.2d 215, at 254; Green, supra, 391 U.S. at 439–441, 88 S.Ct. 1689, 20 L.Ed.2d 716.

The Kalamazoo Board of Education's July 6, 1971 resolution had such a purpose and had an effect so profound that it alone would necessitate a judgment for the plaintiffs in this cause.

The Kalamazoo Board of Education's July 6, 1971 action compounded the effects of the board's earlier constitutionally impermissible actions.

The inclusion of the voluntary open enrollment provision in the Kalamazoo Board of Education's July 6, 1971 resolution will not remove the resolution's constitutional infirmities. The voluntary open enrollment plan was not intended to operate as an effective desegregation device.

Although the May 7, 1971 desegregation plan was somewhat modest, it was *voluntarily* adopted by responsible Kalamazoo school authorities in a bona fide effort to bring substantial equality of opportunity to all children in Kalamazoo as mandated by the Constitution. Since the Kalamazoo authorities were responsibly performing their constitutional duties when they adopted the May 7 plan, this court has also adopted it as the basis for its remedy.

The segregated conditions which existed in Kalamazoo before the adoption of the May 7, 1971 desegregation plan were vestiges of slavery.

### COURT ORDER

As in any school desegregation case where violation of the Fourteenth Amendment has been found, the primary responsibility for providing a remedy lies with the school authorities. In this case, the Kalamazoo Board of Education, the State Board of Education, and the Superintendent of Public Instruction

have operational responsibility for providing education to the children of Kalamazoo.

The court adopts the basic concept of the May 7, 1971 plan, and makes permanent its preliminary injunction issued on August 25, 1971, subject to the modifications hereinafter detailed. The Kalamazoo Board of Education, the State Board of Education, and the Superintendent of Public Instruction, Dr. John W. Porter, are enjoined to continue the operation of the plan as presently implemented, subject to the following qualifications. Since it appears from the record that the present junior high feeder pattern is administratively inconvenient and can be altered to eliminate this inconvenience in accordance with the basic concept of the May 7 plan, the court will hold a hearing on this matter at a date and time to be set.

The court retains continuing jurisdiction to supervise implementation of the plan. Any party may move for amendment or alteration of the plan from time to time if there is a change in circumstances. The party moving for such modification shall have the burden of justifying the changes.

The defendants Michigan State Board of Education and Superintendent of Public Instruction, Dr. John W. Porter, are enjoined from taking any action which will in any manner recreate or perpetuate segregated, racially identifiable schools in Kalamazoo in contravention of the May 7, 1971 plan as adopted by this court. These defendants are further enjoined to render such positive assistance as may be helpful to the Kalamazoo Board of Education in the execution of the Order of this court, providing such assistance is within the constitutional and statutory duties and authorities of the State Board of Education and Superintendent of Public Instruction, respectively.

The Kalamazoo Board of Education is further ordered to apply to the federal government for such financial assistance as may be available to aid the Board in executing the present Order of this court. The Kalamazoo Board of Education is also ordered to make application to the Legislature of the State of Michigan for financial assistance to aid the Board in executing the Order of this court.

The State Board of Education and the Superintendent of Public Instruction are ordered to make, and help as necessary in the preparation of, applications to the federal government for such financial assistance as may be available to aid all parties in the execution of the present Order. These defendants are further ordered to join with the Kalamazoo Board of Education in making application to the Legislature of the State of Michigan for financial assistance.

It is so ordered.

## APPENDIX A

## CONSTITUTION OF UNITED STATES

### AMENDMENT XIV.

§ 1. Citizenship rights not to be abridged by states

Section 1. All persons born or naturalized in the United States, and subject to the jurisdiction thereof, are citizens of the United States and of the State wherein they reside. No State shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any State deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws.

The relevant portion of this section is: "No state shall * * * deny to any person within its jurisdiction the equal protection of the laws." This language is plain, simple, English, and ought to be easily interpreted.

The Supreme Court in Brown v. Board of Education, 347 U.S. 483, 490, 74 S.Ct. 686, 689, 98 L.Ed. 873, stated:

In the first cases in this Court construing the Fourteenth Amendment, decided shortly after its adoption, the Court interpreted it as proscribing all state-imposed discriminations against the Negro race.[5]

[5] Slaughter-House Cases, 16 Wall. 36, 67–72 [21 L.Ed. 394] (1873); Strauder v. West Virginia, 100 U.S. 303, 307–308 [25 L.Ed. 664] (1880): "It ordains that no State shall deprive any person of life, liberty, or property, without due process of law, or deny to any person within its jurisdiction the equal protection of the laws. What is this but declaring that the law in the States shall be the same for the black as for the white; that all persons, whether colored or white, shall stand equal before the laws of the States, and, in regard to the colored race, for whose protection the amendment was primarily designed, that no discrimination shall be made against them by law because of their color? The words of the amendment, it is true, are prohibitory, but they contain a necessary implication of a positive immunity, or right, most valuable to the colored race,— the right to exemption from unfriendly legislation against them distinctively as colored,—exemption from legal discriminations, implying inferiority in civil society, lessening the security of their enjoyment of the rights which others enjoy, and discriminations which are steps towards reducing them to the condition of a subject race."

See also Virginia v. Rives, 100 U.S. 313, 318 [25 L.Ed. 667] (1880); Ex parte Virginia, 100 U.S. 339, 344–345 [25 L.Ed. 676] (1880).

The following are excerpts from cases cited in Brown: Ex parte Virginia explained the purpose of the Amendment:

One great purpose of these amendments was to raise the colored race from that condition of inferiority and servitude in which most of them had previously stood, into perfect equality of civil rights with all other persons within the jurisdiction of the States. They were intended to take away all possibility of oppression by law because of race or color. They were intended to be, what they really are,

limitations of the power of the States and enlargements of the power of Congress. They are to some extent declaratory of rights, and though in form prohibitions, they imply immunities, * * *.

Supra, 100 U.S. at 344–345.

Strauder continues:

"This [the Fourteenth Amendment] is one of a series of constitutional provisions having a common purpose; namely, securing to a race recently emancipated, a race that through many generations had been held in slavery, all the civil rights that the superior race enjoy. The true spirit and meaning of the amendments, as we said in the Slaughter-House Cases (16 Wall. 36, 21 L.Ed. 394), cannot be understood without keeping in view the history of the times when they were adopted, and the general objects they plainly sought to accomplish. At the time when they were incorporated into the Constitution, it required little knowledge of human nature to anticipate that those who had long been regarded as an inferior and subject race would, when suddenly raised to the rank of citizenship, be looked upon with jealousy and positive dislike, and that State laws might be enacted or enforced to perpetuate the distinctions that had before existed. Discriminations against them had been habitual. It was well known that in some States laws making such discriminations then existed, and others might well be expected. The colored race, as a race, was abject and ignorant, and in that condition was unfitted to command the respect of those who had superior intelligence. Their training had left them mere children, and as such they needed the protection which a wise government extends to those who are unable to protect themselves. They especially needed protection against unfriendly action in the States where they were resident. It was in view of

these considerations the Fourteenth Amendment was framed and adopted. It was designed to assure to the colored race the enjoyment of all the civil rights that under the law are enjoyed by white persons, and to give to that race the protection of the general government, in that enjoyment, whenever it should be denied by the States. It not only gave citizenship and the privileges of citizenship to persons of color, but it denied to any State the power to withhold from them the equal protection of the laws, and authorized Congress to enforce its provisions by appropriate legislation. To quote the language used by us in the *Slaughter-House Cases*, "No one can fail to be impressed with the one pervading purpose found in all the amendments, lying at the foundation of each, and without which none of them would have been suggested,—we mean the freedom of the slave race, the security and firm establishment of that freedom, and the protection of the newly made freeman and citizen from the oppressions of those who had formerly exercised unlimited dominion over them." * * *

If this is the spirit and meaning of the amendment, whether it means more or not, it is to be construed liberally, to carry out the purposes of its framers. * * *

* * * If in those States where the colored people constitute a majority of the entire population a law should be enacted excluding all white men from jury service, thus denying to them the privilege of participating equally with the blacks in the administration of justice, we apprehend no one would be heard to claim that it would not be a denial to white men of the equal protection of the laws. Nor if a law should be passed excluding all naturalized Celtic Irishmen, would there be any doubt of its inconsistency with the spirit of the amendment.

Supra, 100 U.S. at 306–308.